**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3432
_____

CLIENTRON CORP.,
                                        Appellant

v.

DEVON IT, INC.; JOHN BENNETT; NANCY DIROCCO
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(E.D. Pa. No. 2-13-cv-05634)
District Judge: Honorable Michael M. Baylson
_____

Argued: January 23, 2018


Before: GREENAWAY, JR., KRAUSE, *Circuit Judges*, and
JONES, *District Judge*.[*]

(Opinion Filed: July 5, 2018)

_____

[*] The Honorable John E. Jones III, United States
District Judge for the Middle District of Pennsylvania, sitting
by designation.

John D. van Loben Sels      [Argued]
Fish IP Law
333 Twin Dolphin Drive, Suite 200
Redwood City, CA 94065
            *Counsel for Appellant*


Gary M. Samms      [Argued]
Obermayer Rebmann Maxwell & Hippel LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
            *Counsel for Appellees*

_____


OPINION

_____


GREENAWAY, JR., *Circuit Judge*.

In this unusual case, Appellant Clientron Corp. is actually the prevailing party below and holds a judgment against Appellee Devon IT, Inc. worth over $7 million. Clientron claims, however, that it is unable to recover because Devon IT is insolvent. Before the District Court and now also on appeal, Clientron has argued that Devon IT's corporate veil should be pierced, and that the two shareholders who own Devon IT as tenants by the entirety, Appellees John Bennett and Nance DiRocco, should be held personally liable for the entire judgment. Although the District Court declined to

2

disregard Devon IT's corporate form on the merits, it held Bennett—but not DiRocco—personally liable for a portion of the judgment as a sanction for egregious discovery misconduct. According to Clientron, this decision to sanction only Bennett was insufficient because he, like Devon IT, is judgment-proof. Clientron contends that it can recover only if DiRocco is held personally liable for the judgment as well.

As we will explain below, we hold that, irrespective of whether the imposed sanction was sufficient to cure the prejudice suffered by Clientron, the District Court committed legal error in piercing Devon IT's veil as a sanction to reach Bennett but not DiRocco, and in holding Bennett personally liable for only part of the judgment. We will therefore vacate the District Court's order sanctioning Bennett and remand so that the District Court may impose a new sanction.

## I. BACKGROUND

### A. The Parties' Contractual Relationship and This Litigation

Clientron is a Taiwanese manufacturer and distributor of computer components. Devon IT is a Pennsylvania corporation that sells computer hardware and software and whose sole shareholders are John Bennett and Nance DiRocco, a married couple that jointly owns one hundred percent of Devon IT's shares as tenants by the entirety. Devon IT is one of at least twenty-four business entities that Bennett and DiRocco have owned together using the tenancy by the entirety ownership form. Many of these entities bear similar names that somehow incorporate the word "Devon." Devon IT was incorporated in 1999 as an S corporation. At first, its primary function was to provide IT services to other Devon entities, but

3

by 2005, it had begun to transition from performing internal work to providing services for other companies.

In 2010, Devon IT was awarded a contract from Dell to sell "thin client" computer products.[1]  Devon IT in turn contracted with Clientron to manufacture the computers that Dell was to purchase.  Under the arrangement, Clientron manufactured the goods and shipped them directly to Dell, and Dell paid Devon IT, who in turn paid Clientron.  But Devon IT stopped paying Clientron entirely in March 2012.  At the time, Devon IT owed Clientron over $6 million in unpaid invoices for products Clientron had provided.  Sometime thereafter, Dell terminated its relationship with Devon IT and paid Devon IT $2 million, none of which ever made its way to Clientron.

Pursuant to the parties' agreement, Clientron submitted a request for arbitration to the Chinese Arbitration Association in Taiwan in September 2012, claiming that Devon IT had breached its obligations under the parties' agreement.  The Taiwanese arbitrators ruled in Clientron's favor and awarded over $6.5 million in damages.

Clientron then sued Devon IT, Bennett, and DiRocco in the Eastern District of Pennsylvania seeking to enforce the arbitration award.  In a second suit that was later consolidated with the first, Clientron sought an additional $14.3 million in damages from the three Defendants for fraud and breach of

---

[1] "Thin clients" are lightweight computers that are dependent on a remote server to fulfill their computational roles and are typically components of broader computer infrastructures.

4

contract stemming from Devon IT's refusal to pay for products in purchase orders that were not covered by the Taiwanese arbitration. Clientron further alleged that, under Pennsylvania law, Devon IT was the alter ego of its two sole shareholders, Bennett and DiRocco, and it asked the District Court to pierce Devon IT's corporate veil.[2]

## B.      The Appellees' Discovery Misconduct

During pretrial discovery, the Defendants continually failed to meet their obligations under the Federal Rules. In response to Clientron's requests for documents, they initially asserted frivolous general objections before eventually making either incomplete or non-responsive productions. At one point, they produced ninety-three boxes of irrelevant documents without sorting the documents into topics or categories. Moreover, despite being properly served with two deposition notices under Federal Rule of Civil Procedure 30(b)(6), which requires a corporation to designate a witness to testify on its behalf, Devon IT never designated such a witness at all, let alone regarding basic topics relevant to Clientron's alter ego claims, such as the administration of Devon IT's bank records, general ledger, and other corporate records. Defendants' counsel represented to the District Court that he overlooked the second Rule 30(b)(6) notice, but both the court and Clientron repeatedly reminded counsel and the Defendants themselves that they needed to designate a witness on the topics in the

---

[2] Devon IT asserted counterclaims against Clientron as well, but Devon IT did not prevail on these claims below, and they are not at issue in this appeal.

notice. Without any adequate explanation, however, the Defendants never produced a knowledgeable witness.

Meanwhile, Bennett, who was the chairman and sole member of Devon IT's board of directors, claimed to be unfamiliar with virtually all details of the case during his deposition. He maintained, for example, that he was unaware of whether Devon IT even maintained a general ledger. He further stated that he was unable to testify regarding any of Devon IT's defenses or counterclaims. Bennett also continued his practice of regularly deleting all of the sent and received emails from his personal account after he knew a dispute had arisen with Clientron, and even after Clientron had filed suit.

As a result of the Defendants' discovery practices, Clientron filed four separate motions to compel, as well as multiple letters to the District Court detailing their discovery issues. The District Court, for its part, entered four separate orders requiring the Defendants to provide discovery. After the Defendants failed to comply with those orders and Clientron filed a motion for sanctions, the court concluded that the Defendants' conduct was willful and in bad faith, and that the prejudice to Clientron was "obvious" because there was a "high probability that relevant information ha[d] not been provided." App. 14. Accordingly, in an August 28, 2015 order, the court issued a number of sanctions against Devon IT. First, it imposed a monetary sanction of $44,320.50 corresponding to the extra costs incurred by Clientron. Second, it excluded Devon IT's evidence supporting its defense that the arbitration award should not be enforced because the arbitration clause in the parties' agreement did not cover the products that were at issue in the arbitration. And third, the District Court excluded any evidence supporting Devon IT's defenses to Clientron's non-arbitrated breach of

6

contract claim that had not already been disclosed during pretrial proceedings.

Importantly, however, the District Court initially refrained from issuing any sanctions against Bennett individually because he had then recently filed for bankruptcy and was protected by an automatic stay. The court instead stated that it would reserve consideration of whether piercing the corporate veil would be an appropriate sanction to impose against him. DiRocco was not a party to Bennett's bankruptcy case, but the court nonetheless declined to sanction her individually because it concluded that she had not personally participated in any of the discovery misconduct.

## C.    The Enforcement of the Arbitration Award and the Jury Trial

On the same day that it issued discovery sanctions against Devon IT, the District Court granted Clientron's motion for summary judgment with respect to the arbitration award and enforced the roughly $6.5 million award against Devon IT plus interest and costs, equaling a total amount of $6,943,817.13. The court concluded that the award should be enforced as a matter of comity under governing Pennsylvania law. Clientron's non-arbitrated breach of contract and fraud claims then proceeded to a jury trial. The issue of whether Devon IT's corporate veil should be pierced also proceeded to trial, but the District Court ruled that the jury's verdict on that point would be advisory only.

Despite being provided with inadequate discovery, Clientron was nevertheless able to present a variety of evidence at trial in support of its contention that veil piercing was

7

appropriate. Its accounting expert, Kyle Midkiff, testified that, based on the limited discovery provided, she was able to discern that, from 2010 to 2013, $24 million was siphoned from Devon IT to other Bennett and DiRocco-owned entities. And Midkiff saw that one of the Devon entities receiving the most money from Devon IT subsequently made payments into Bennett's personal account. Midkiff also explained that Devon IT's general ledger showed that Devon IT had made a $3.5 million loan to its shareholders, Bennett and DiRocco. The same loan appeared on Devon IT's 2010 tax return as well. Both Bennett and DiRocco, however, denied receiving the loan—or any loan from Devon IT for that matter—and claimed there must have been a mistake in the records.

Moreover, Midkiff testified that, in recent years, both Bennett and DiRocco's credit card purchases had exceeded the income reflected on their personal tax returns. While the "limited financial records" Devon IT had turned over left Midkiff unable to conclude definitively that corporate funds were used to pay these personal expenses, she said that it was likely Bennett and DiRocco had received money from their corporations and commingled personal and corporate finances. App. 960.

Midkiff further testified that, from 2010 to 2013, there was a total of $79 million in deposits that went into Devon IT's account, yet Devon IT was nonetheless insolvent from at least 2009 to 2012. Indeed, Bennett himself testified that Devon IT did not make any money from 2008 to 2012. Midkiff also explained that Devon IT rented office space from another company owned by Bennett and DiRocco, but notably, no leases or other documents appeared to exist with respect to this arrangement, and rent payments fluctuated dramatically between 2011 and 2013.

8

Despite pleading ignorance during discovery, Bennett admitted at trial that he made the decision to spend the $2 million termination payment from Dell on Devon IT's operation costs instead of paying Clientron. Bennett similarly admitted that he and two other Devon IT officers made the decision to spend the proceeds from other settlements on Devon IT operation costs and other corporate debts.

Meanwhile, DiRocco testified that she had virtually no role in Devon IT's operations, nor did she have any meaningful knowledge of its activities. Instead, as DiRocco acknowledged, she gave Bennett a proxy to act on her behalf. He had "unfettered discretion" to spend money in the entities that they owned together and to sign DiRocco's name on documents in connection with those entities. App. 924. DiRocco testified, however, that she occasionally hosted meals for Bennett's business guests when they came to her home, and she claimed $6,386 in meals and entertainment expenses on Devon IT's 2010 tax return.

Although Bennett was chairman and sole member of Devon IT's board of directors, evidence was also presented that Devon IT employed functional officers, including a Chief Operating Officer, and a Chief Technology Officer, who purportedly oversaw day-to-day operations and met with Bennett regularly. And there was evidence that, at least at one time, Devon IT had somewhere between thirty and forty employees.

At the conclusion of trial, the District Court instructed the jury that it was permitted, but not required, to make an adverse inference against Devon IT due to its earlier discovery

9

conduct; the instruction did not reference Bennett or DiRocco by name. The jury ultimately returned a verdict finding Devon IT liable for breach of contract, and it awarded Clientron an additional $737,018 in damages. But the jury rejected Clientron's fraud claim and declined to pierce Devon IT's corporate veil to hold Bennet and DiRocco jointly and severally liable for the contract judgment.

## D. The District Court's Post-Trial Rulings

In a memorandum opinion following trial, the District Court adopted the jury's verdict declining to pierce Devon IT's corporate veil. Importantly, the court did not adopt an adverse inference. It instead emphasized that much of Clientron's evidence was "[s]peculative, [c]onclusory, or [i]ncomplete." App. 55. For instance, the court acknowledged that Devon IT had sent more than $24 million to other Devon-related entities between 2010 and 2013, but it stressed that Clientron had not shown how any of that money had made its way into Bennett's and/or DiRocco's personal accounts, or how the transactions were otherwise improper. The court similarly emphasized that it was Clientron's burden to prove that the alleged $3.5 million loan actually existed and was issued for some improper purpose. Finding the evidence Clientron presented equally consistent with "sloppy record keeping," the court concluded that Clientron had failed to meet that burden. App. 56.

Regarding the rent arrangement with the other company owned by Bennett and DiRocco, the court conceded that the payment "fluctuations were admittedly suspicious given an apparent lack of formal leases documenting how rent was calculated," but absent more concrete evidence, the court could not conclude that the rent payments represented a commingling

10

of funds. App. 58. "One possible explanation," the court believed, was that Devon IT's office space "expanded once the Dell contract was signed and then shrank dramatically following the contract's 2012 cancellation." *Id.* 58 n.10. With respect to the Dell money and other settlement proceeds that Bennett had diverted away from Clientron, the court determined that Clientron had not proven that any of the money "was in fact used to benefit Bennett and DiRocco personally as opposed to benefitting Devon IT, albeit in flagrant breach of Devon IT's contractual obligations." App. 60. The court concluded that, without more, Clientron had failed to establish that Devon IT was Bennett and DiRocco's alter ego. It therefore declined to disregard Devon IT's corporate form.

However, in the same opinion, the District Court proceeded to pierce the veil to reach Bennett's assets as a sanction for his previous discovery misconduct. As Bennett's bankruptcy stay had by then been lifted, the court purported to "join[] a number of other courts which have held that piercing the corporate veil is an appropriate sanction for discovery misconduct impeding a party's ability to prove alter ego liability," reasoning that "Bennett's conduct seriously impeded Clientron's ability to prove alter ego liability and warrants strong sanctions." App. 67. "Simply put," the court stated, "Clientron would likely have had a much stronger case before the jury if not for Bennett's egregious misconduct." App. 68. But the court did not pierce the veil to reach DiRocco, reiterating its earlier conclusion that she had not personally participated in any of the discovery misconduct. And the court made Bennett personally liable for only the $737,018 damages award from the jury trial and the $44,320 monetary sanction earlier imposed on Devon IT; without explanation, it did not make Bennett personally liable for the $6.9 million Taiwanese

11

arbitration award that the court had previously enforced against Devon IT. Clientron then filed this appeal.

## II. JURISDICTION

The District Court had jurisdiction under 28 U.S.C. § 1332(a). We have jurisdiction under 28 U.S.C. § 1291.

## III. DISCUSSION

Pursuant to Pennsylvania law, property owned as tenants by the entirety cannot be accessed by the creditors of only one spouse. *See Madden v. Gosztonyi Savings & Trust Co.*, 200 A. 624, 627–28 (Pa. 1938). Thus, under the belief that Devon IT is insolvent and that Bennett is similarly judgment-proof because of his bankruptcy, Clientron asks this Court to make DiRocco personally liable for the judgment so that it can reach the property the couple owns jointly. Clientron argues that the District Court erred in declining to pierce the veil on the merits under Pennsylvania law, and in the alternative, that the District Court erred in refusing to pierce the veil with respect to DiRocco as a discovery sanction. It further contends that the District Court should have made both Bennett and DiRocco personally liable for the entire judgment, including the $6.9 million arbitration award.

### A.    The Merits of Clientron's Alter Ego Claim

Clientron first argues that, notwithstanding the Appellees' discovery misconduct, it presented sufficient evidence at trial to pierce the corporate veil under Pennsylvania law and reach the personal assets of both Bennett and DiRocco. Clientron therefore contends that the District Court erred in

12

adopting the jury's advisory verdict that declined to pierce the veil.

We review for clear error the District Court's findings of fact. *See McGann v. Cinemark USA, Inc.*, 873 F.3d 218, 223 (3d Cir. 2017). We exercise plenary review over the District Court's ultimate legal determination of whether to pierce the corporate veil based on those facts. *Craig v. Lake Asbestos of Que., Ltd.*, 843 F.2d 145, 148 (3d Cir. 1988) ("[W]hen a district court sitting in diversity applies state legal precepts to determine whether to pierce the corporate veil, the legal conclusion that it has drawn from the facts found is subject to plenary review.").

Piercing the corporate veil "is an equitable remedy whereby a court disregards 'the existence of the corporation to make the corporation's individual principals and their personal assets liable for the debts of the corporation.'" *In re Blatstein*, 192 F.3d 88, 100 (3d Cir. 1999) (quoting *In re Schuster*, 132 B.R. 604, 607 (Bankr. D. Minn. 1991)). "Pennsylvania law, applicable here, recognizes a strong presumption against piercing the corporate veil." *Id.* (citing *Lumax Indus., Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995)). Applying Pennsylvania law, we have previously observed that

> the factors weighing in favor of piercing the veil include: "failure to observe corporate formalities, non-payment of dividends, insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant shareholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is

13

merely a facade for the operations of the dominant stockholder or stockholders."

*Id.* (quoting *Kaplan v. First Options of Chi., Inc.*, 19 F.3d 1503, 1521 (3d Cir. 1994)); *see also Lumax*, 669 A.2d at 895. Not all factors need to be present; rather, the evidence must ultimately show that the corporation was "nothing more than a sham used to disguise [the shareholders'] use of its assets for [their] own benefit in fraud of its creditors." *Blatstein*, 192 F.3d at 100 (quoting *Kaplan*, 19 F.3d at 1521).

Here, setting aside the Appellees' discovery misconduct, we agree with the District Court that Clientron did not establish that Devon IT was merely a sham. Although it is evident that Devon IT withheld funds from Clientron in obvious breach of its contractual obligations, Clientron could not show that such withholding benefitted Bennett's and DiRocco's individual interests as opposed to benefitting Devon IT. Indeed, Clientron presented evidence regarding money transfers between Bennett and DiRocco-owned entities, but it was unable to show how those transfers benefitted Bennett and DiRocco personally as individuals. Testimony at trial, meanwhile, indicated that Devon IT had several functional officers, who ran day-to-day operations of the company while regularly consulting with Bennett, as well as between thirty and forty employees.

Admittedly, Clientron did present evidence that gives us pause. The evidence concerning the $3.5 million loan from Devon IT to Bennett and DiRocco, while conflicting, certainly raises suspicions. As does the evidence regarding Bennett and DiRocco's credit card purchases, the fluctuations in Devon IT's rent payments, and the amount of money transferred from Devon IT to other entities owned by Bennett and DiRocco. But

14

although this evidence certainly shows that Bennett and DiRocco did not strictly adhere to corporate formalities, it fails to prove that Devon IT was nothing more than a sham used to disguise Bennett and DiRocco's use of corporate assets for personal use. *Cf. Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 196 (3d Cir. 2003) (observing that, under federal corporate law, "lack of formalities in a closely-held or family corporation does not often have as much consequence as where other kinds of corporations are involved" (citation omitted)). Thus, without more, Clientron's evidence is insufficient to overcome Pennsylvania's strong presumption against piercing the corporate veil.[3]

---

[3] In arguing that it has met its burden, Clientron urges us to adopt an adverse inference to account for the Appellees' discovery misconduct. This argument, however, conflates the two issues on appeal. Seeing that the District Court imposed a different discovery sanction, we see no basis for adopting an adverse inference at this juncture as an additional sanction. As we will explain in detail below, we conclude that the chosen sanction below was legally erroneous, but the choice of whether to impose an adverse inference as an alternative sanction will be the District Court's to make on remand. Accordingly, for now, we take no position on whether an adverse inference would impact the result of the alter ego inquiry on the merits. We hold only that, without the aid of an adverse inference, Clientron has not established under Pennsylvania law that Devon IT was its shareholders' alter ego.

## B. The District Court's Veil Piercing Discovery Sanction

Clientron next argues that even if it failed to meet its burden on the merits of the Pennsylvania alter ego claim, the District Court should have pierced the veil as to both Bennett and DiRocco as a discovery sanction. It contends that both Bennett and DiRocco should be held personally liable because DiRocco's personal conduct was sanctionable, and because there is no legal basis for distinguishing between shareholders when piercing the corporate veil.

We review for abuse of discretion a district court's decision to impose discovery sanctions. *McLaughlin v. Phelan Hallinan & Schmieg, LLP*, 756 F.3d 240, 248 (3d Cir. 2014). "While this standard of review is deferential, a district court abuses its discretion in imposing sanctions when it 'base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Bowers v. Nat'l Collegiate Athletic Ass'n (Bowers II)*, 475 F.3d 524, 538 (3d Cir. 2007) (alteration in original) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)), *as amended on reh'g* (Mar. 8, 2007).

Here, the District Court undoubtedly possessed the authority to impose some kind of sanction against Bennett under Federal Rule of Civil Procedure 37.[4] Specifically, Rule

[4] Federal courts possess inherent authority to impose sanctions as well, and this "power . . . can be invoked even if procedural rules exist which sanction the same conduct." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991). Our "preferred" course, however, is that when "statutory or rules-based sanctions are entirely adequate, they should be invoked,

16

37(b)(2)(A) states, in part, that "[i]f a party . . . fails to obey an order to provide or permit discovery . . . , the court where the action is pending may issue further just orders" sanctioning the offending party.  The potential sanctions endorsed by the Rule include, among others, "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims; . . . prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;" and "rendering a default judgment against the disobedient party."[5]  Fed. R. Civ. P. 37(b)(2)(A)(i)–(ii), (vi).

<hr />

rather than the inherent power."  *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 189 (3d Cir. 2002) (quoting Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* 428 (3d ed. 1999)).  Because we find that Rule 37 provides an adequate basis for sanctions in this case, we decline to interpret the District Court's imposed sanction as an exercise of its inherent powers.

[5] Rule 37(b)(2)(A) also states that courts may sanction discovery misconduct by "striking pleadings in whole or in part; . . . staying further proceedings until the order is obeyed; [or] dismissing the action or proceeding in whole or in part." Fed. R. Civ. P. 37(b)(2)(A)(iii)–(v).  Rule 37(e) is of potential relevance in this case as well, though it is clear that the District Court did not rely on it.  That provision provides, in part, that courts may impose an adverse inference, dismiss the action, or enter a default judgment "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, . . . it cannot be restored or replaced

17

It is not evident that the District Court in this case imposed one of the listed sanctions, though. It is apparent that the court ultimately held Bennett liable for the $737,018 breach of contract damages award from the jury trial and the $44,320 monetary sanction previously imposed on Devon IT, but how it got to that outcome is less clear.

As we will explain below, one might initially think that the District Court applied Rule 37(b)(2)(A)(i) to "establish[] for purposes of the action" that Devon IT was Bennett's alter ego under Pennsylvania law. But because such a ruling would have required the court to hold both Bennett and DiRocco personally liable for the entire judgment—something the court did not do—it is not a reasonable interpretation of the District Court's decision. Thus, as we will also explain below, we are forced to conclude that the court's veil piercing remedy was grounded in federal law. Our task here on appeal, then, is to determine whether Rule 37 authorizes the fashioning of such a remedy. We conclude that it does not and will therefore vacate the District Court's sanctioning order.

### 1. Pennsylvania law and establishing alter ego for purposes of the action under Rule 37(b)(2)(A)(i)

Of the sanctions expressly endorsed by Rule 37(b)(2)(A), the most plausible option in this case is that the District Court "established for purposes of the action" under Rule 37(b)(2)(A)(i), that Devon IT was Bennett's alter ego

---

through additional discovery," and the court "find[s] that the party acted with the intent to deprive another party of the information's use in the litigation."

18

under Pennsylvania law. But such an interpretation seems a stretch; there is little indication that the District Court had Rule 37(b)(2)(A)(i) in mind when imposing its sanction. For one, in its opinion, the court never used the language of Rule 37(b)(2)(A)(i) or even cited Rule 37 at all. Instead, it said that it was "piercing the corporate veil" as a sanction "for discovery misconduct impeding a party's ability to prove alter ego liability." App. 67. The court had also just held—earlier in the exact same opinion—that Devon IT was *not* Bennett's or DiRocco's alter ego under Pennsylvania law. It would be odd if the District Court, having just made an adjudication on the merits of the alter ego issue, immediately turned around and reversed that adjudication as a discovery sanction.

But more importantly, the District Court neglected to even consider the implications of establishing alter ego under Pennsylvania law for purposes of the action. Indeed, if the court had examined Pennsylvania law, it would have seen that two different legal consequences would necessarily follow from establishing that Devon IT was Bennett's alter ego.

First, establishing alter ego with respect to Bennett would have necessarily made DiRocco personally liable for the judgment as well, because in Pennsylvania, there is no basis for distinguishing between two tenants by the entirety when piercing the corporate veil based on an alter ego theory. Under Pennsylvania law, alter ego liability does not necessarily hinge on an individual shareholder's personal conduct. Indeed, the Pennsylvania Supreme Court has emphasized the "distinction between liability for individual participation in a wrongful act and an individual's responsibility for any liability-creating act performed behind the veil of a sham corporation." *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 89 (Pa. 1983). "Where the court pierces the corporate veil, the owner is liable because

19

the corporation is not a bona fide independent entity; therefore, its acts are truly his." *Id.* at 89–90.

Distinguishing between shareholders for alter ego purposes is especially problematic where, as here, the corporation is owned jointly by two tenants by the entirety. Applying Pennsylvania law, we have previously stated that tenancies by the entirety are "based on the legal fiction that husband and wife are one person." *In re Brannon*, 476 F.3d 170, 173 (3d Cir. 2007). The ownership form's "essential characteristic" is that each spouse holds "the whole or the entirety," and not a "share, moiety or divisible part." *Id.* (quoting *In re Gallagher's Estate*, 43 A.2d 132, 133 (Pa. 1945)). The only ways the tenancy may be severed, "other than by the death of one of the spouses, are 'a joint conveyance of the state, divorce, or mutual agreement,'" *id.* (quoting *Clingerman v. Sadowski*, 519 A.2d 378, 381 (Pa. 1986)), none of which is at issue in this case. And as long as the tenancy remains intact, "[i]t is presumed that each tenant by the entirety may, without specific consent, act individually on behalf of both." *Id.*

Taking all of these considerations together, a conclusion that a corporation was the alter ego of one shareholder tenant by the entirety, but not the other, is legally untenable in Pennsylvania. *Id.* In this case, Bennett and DiRocco did not hold equal fifty percent shares in Devon IT. Instead, they together owned an undivided whole of the company, and they each possessed the right to act on their spouse's behalf. The focus of the alter ego inquiry, meanwhile, is whether Devon IT was a bona fide independent entity—not whether each shareholder was personally liable for the particular injury at issue. Thus, it is irrelevant that DiRocco chose not to frequently participate in Devon IT's affairs, despite her

20

unqualified right to do so at any time. Her supposed ignorance about a corporation in which she held a one hundred percent ownership stake cannot shield her from liability once it has been established that the corporation was a sham.

Moreover, even if Pennsylvania law did require some degree of personal involvement, evidence was presented at trial regarding DiRocco's participation in some corporate affairs. She admitted that she occasionally hosted meals for Bennett's business guests. Indeed, she claimed $6,386 in meal and entertainment expenses on a Devon IT tax return. Her name was also signed (purportedly by Bennett) on Devon IT documents, and she admitted that she took no issue with those signatures. Thus, a holding on the merits under Pennsylvania law that Devon IT was Bennett's alter ego would necessarily mean Devon IT was also DiRocco's alter ego, and if the District Court wanted to "establish" alter ego as a discovery sanction, it needed to hold DiRocco liable together with Bennett.

There is also a second legal consequence of establishing alter ego under Pennsylvania law that the District Court neglected to impose: Bennett and DiRocco would be personally liable for the entire judgment against Devon IT— that is, not just the $737,018 in contract damages and the $44,320 in discovery sanctions, but also the $6.9 million Taiwanese arbitration award. As we explained above, when alter ego is established under Pennsylvania law, the corporation's acts are attributed to its shareholders, and the shareholders are personally liable for the damages arising out of those acts. Accordingly, establishing alter ego in this case would mean that Devon IT's act of breaching its agreement with Clientron would be attributed to Bennett and DiRocco, and they would be liable for all of the damages resulting from

21

the breach. The District Court, however, held Bennett liable for only some of the damages. Without explanation and without citing any Pennsylvania authority, the court did not include in the judgment against Bennett the $6.9 million arbitration award. Although the $6.9 million were initially awarded in a Taiwanese arbitral forum, they are nonetheless damages from Devon IT's breach of contract, and the District Court had previously decided that the award should be enforced. If the District Court wanted to establish alter ego under Pennsylvania law, it needed to include the $6.9 million arbitration award in the judgment against the individual shareholders.[6]

## 2. Piercing the corporate veil as a matter of federal law

---

[6] At first blush, one might think that the District Court may have alternatively invoked Rule 37(b)(2)(A)(vi) and rendered a default judgment against Bennett on Clientron's breach of contract claim that had proceeded to trial. But for similar reasons, this too is an unreasonable interpretation of the court's decision. It is true that issuing a default judgment would have had nearly the same effect as the veil piercing sanction the court ultimately imposed: holding Bennett liable for the $737,018 in damages from the breach of contract claim. Importantly, however, the District Court here also held Bennett personally liable for the $44,320 monetary sanction previously imposed on Devon IT—something a default judgment on only the breach of contract claim could not have accomplished. And in its sanctioning decision, the District Court never once used the word "default." Thus, it is not a fair reading of the court's ruling to say that it entered a default judgment against Bennett.

22

Having taken account of Pennsylvania law and ruled out Rule 37(b)(2)(A)(i), the District Court's chosen sanction in this case begins to come into focus. By departing from the mandates of governing Pennsylvania law, the District Court appears to have granted a remedy grounded, not in the operative substantive law of the case, but in newly-developed federal law. And the standards governing that federal remedy—though not entirely clear—are evidently different than those governing its state counterpart on the merits. In other words, the District Court used judicially-created federal law to essentially split the baby in a way that the substantive state law at issue in the suit would not have permitted. Our task here, then, is to determine whether Rule 37 authorizes such an exercise of federal lawmaking. We conclude that it does not.

Admittedly, the list of sanctions provided by Rule 37(b)(2)(A) is not exhaustive, and the decision to impose sanctions is "generally entrusted to the discretion of the district court." *Bowers II*, 475 F.3d at 538. Thus, the District Court's decision to depart from the list of sanctions expressly endorsed by the rule is not fatal. But Rule 37(b)(2)(A) is not equivalent to carte blanche; it limits courts' discretion in two ways: "First, any sanction must be 'just'; second, the sanction must be *specifically related* to the particular 'claim' which was at issue in the order to provide discovery." *Harris v. City of Phila.*, 47 F.3d 1311, 1330 (3d Cir. 1995) (emphasis in original) (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites*, 456 U.S. 694, 707 (1982)).

Both of these limitations are rooted in notions of due process. The first "represents the general due process restrictions on the court's discretion." *Ins. Corp. of Ir.*, 456 U.S. at 707. The second requires that a "specific nexus" exist

23

between the sanction imposed and the underlying discovery violations. *Harris*, 47 F.3d at 1330–31. Or put differently, it requires that the unproduced discovery be sufficiently "material to the administration of due process" to support a presumption that the failure to produce constituted an admission by the offending party that its asserted claim or defense lacked merit. *Ins. Corp. of Ir.*, 456 U.S. at 705 (quoting *Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 351 (1909)).

Neither of Rule 37(b)(2)(A)'s requirements was met in this case. We are unwilling to conclude that the "general due process restrictions" on a federal court's discretion permits it to circumvent the substantive law governing a lawsuit by developing its own, different, federal law standards based on a party's discovery misconduct. Likewise, no *specific* nexus exists between the sanction imposed and the particular claim at issue when the court inserts a new, judicially-created legal remedy into the lawsuit as the means of imposing the sanction. Rule 37(b)(2)(A) certainly allows courts to adopt conclusions, presumptions, inferences, or evidentiary preclusion rules that operate within the confines of the claims and defenses the parties have already raised,[7] but we cannot say that it

---

[7] Courts may also impose monetary sanctions under Rule 37, but only those that represent the "reasonable expenses" and costs resulting from the discovery misconduct. *See* Fed. R. Civ. P. 37(b)(2)(C); *Martin v. Brown*, 63 F.3d 1252, 1263–64 (3d Cir. 1995). The Appellees urge us to view the sanction in this case as essentially a monetary sanction imposed on Bennett. Even if we found this conception of the sanction persuasive, we would still hold the sanction an abuse of discretion because the monetary amount would be in no way

24

authorizes courts to create new federal law remedies that liberate the courts from those confines entirely.[8]

Again, here, having already concluded that Devon IT was not Bennett and DiRocco's alter ego as a matter of Pennsylvania law, the District Court proceeded to pierce the corporate veil anyway. And it did so in a manner that, as explained above, Pennsylvania law would not have allowed: it distinguished between two tenants by the entirety and pierced with respect to only part of the judgment.

None of the cases that the District Court cited supports such a broad exercise of judicial lawmaking authority. Rather, where courts in the past have pierced the veil due to discovery misconduct, they have done so through the imposition of a default judgment or legal presumption, or through the preclusion of evidence—all of which operate within the

---

connected to the expenses and costs Clientron incurred as a result of the Appellees' discovery misconduct.

[8] Indeed, we have emphasized that federal courts' "power to formulate federal common law is implicated in two basic types of cases: where a federal rule of decision is necessary to protect 'uniquely federal interests,' and where 'Congress has given the courts the power to develop substantive law.'" *Bowers v. Nat'l Collegiate Athletic Ass'n (Bowers I)*, 346 F.3d 402, 423 (3d Cir. 2003) (quoting *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981)). In this context, we are unable to identify a uniquely federal interest that would justify the exercise of substantive common lawmaking power, nor do we see any evidence that Congress intended to authorize such power.

25

parameters of the claims and defenses raised by the parties.[9] *See, e.g.*, *S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 146–49 (2d Cir. 2010) (affirming district court's sanction deeming that alter ego allegations had been established and court's rendering of a default judgment against all defendants after issues of corporate liability and damages had already been decided); *Global NAPs, Inc. v. Verizon New Eng. Inc.*, 603 F.3d 71, 93–94 (1st Cir. 2010) (affirming default judgment on alter ego claim that was entered as discovery sanction); *Compaq Comput. Corp. v. Ergonome Inc.*, 387 F.3d 403, 412–14 (5th Cir. 2004) (affirming in part district court's finding of alter ego as a discovery sanction under Rule 37(b)(2)(A)(i)); *Flame S.A. v. Indus. Carriers, Inc.*, 39 F. Supp. 3d 752, 766–67 (E.D. Va. 2014) (establishing for purposes of the action, under Rule 37(b)(2)(A)(i), that two of the corporate defendants were alter egos of one another), *aff'd sub nom. Flame S.A. v. Freight Bulk Pte. Ltd.*, 807 F.3d 572, 585 n.10 (4th Cir. 2015) (commenting that district court's sanction "likely would have . . . been an appropriate exercise" of discretion, but ultimately

---

[9] Importantly, when a court enters a default judgment, it does so by adjudicating liability with respect to a particular claim that the plaintiff has raised and then awarding the damages that correspond to such an adjudication of liability. Here, as we have explained, the District Court's sanction held Bennett liable for not only the damages corresponding to Clientron's non-arbitrated breach of contract claim, but also the monetary sanction previously imposed on Devon IT— something a default judgment could not have accomplished. We therefore need not decide whether it would have been an abuse of discretion if the District Court had rendered a default judgment here.

concluding that issue had not been developed sufficiently for review on appeal); *Sentry Ins. A Mut. Co. v. Brand Mgmt., Inc.*, 295 F.R.D. 1, 8 (E.D.N.Y. 2013) (precluding disobedient party from offering evidence in opposition to plaintiff's alter ego claim).

Those cases, as well as countless others, show that Rule 37(b) "provides a 'veritable arsenal of sanctions'" to deter and rectify discovery violations. *Companion Health Servs., Inc. v. Kurtz*, 675 F.3d 75, 84 (1st Cir. 2012) (quoting *Crispin-Taveras v. Municipality of Carolina*, 647 F.3d 1, 7 (1st Cir. 2011)). There are, however, limits to courts' discretion. In this case, it would be understandable if the District Court's instinct was to fashion a creative remedy that it thought would correspond to the severity of the misconduct. But by failing to ground its veil piercing remedy in the substantive state law that governed the suit, the District Court went beyond its Rule 37 authority and abused its discretion. The sanction was based "on an erroneous view of the law." *Bowers II*, 475 F.3d at 538. We will accordingly vacate the court's order holding Bennett liable for the $737,018 in damages from the breach of contract claim and the $44,320 monetary sanction. Because the authority to impose sanctions for discovery violations committed in the district courts is generally entrusted to the discretion of those courts in the first instance, we will remand for further proceedings.

### 3.      Considerations on Remand

On remand, it will be within the District Court's discretion to impose a new discovery sanction that is consistent with Rule 37. It bears emphasis that nothing in this opinion should be read to cast doubt on the District Court's authority to levy a sanction given the gravity of the misconduct, nor

27

should the opinion be read to take issue with the severity of the sanction originally imposed. It is the legal mechanism employed that ran afoul of Rule 37 here.

In light of our analysis regarding tenancies by the entirety, we expect that the District Court will have little problem imposing a proper sanction on remand that achieves the desired effect and addresses the prejudice suffered by Clientron. Indeed, in piercing the veil against Bennett as a sanction, the court expressly found that "Clientron would likely have had a much stronger case before the jury if not for [his] egregious misconduct." App. 67–68. Insofar as the court declined to extend this sanction to DiRocco on the ground that the record did not show she was personally involved in that misconduct, this, as we have explained, was error, as tenancies by the entirety are "based on the legal fiction that husband and wife are one person," *In re Brannon*, 476 F.3d at 173, and so had Clientron prevailed on its alter ego claim, Pennsylvania law would have required that both Bennett and DiRocco be held personally liable. Thus, DiRocco undoubtedly benefitted from Bennett's discovery misconduct. By, as the District Court put it, "seriously imped[ing] Clientron's ability to prove alter ego liability," App. 67, Bennett protected DiRocco. That the record did not reveal DiRocco's personal participation in the discovery misconduct would likely be relevant in the vast majority of cases, but the existence of the tenancy by the entirety changes the calculus here. While we have said that "the extent of [a] party's personal responsibility" is one of the factors to be "balanced" when imposing a discovery sanction, *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984), we have never held that personal wrongdoing is an absolute prerequisite in all instances. This case is unusual because Pennsylvania law regarding alter ego liability and

28

tenancies by the entirety make it so Bennett's and DiRocco's interests are perfectly aligned, and because Clientron has made plausible allegations that DiRocco's passive role was part and parcel of their abuse of the corporate form. We think, under these unique circumstances, the limitations on the District Court's Rule 37 authority do not require that DiRocco be shielded entirely from the ramifications of a sanction imposed due to discovery misconduct committed by her co-defendant husband.

With all this said, an adverse inference and/or the preclusion of evidence are potential options on remand. By allowing the consideration of the discovery misconduct within the merits analysis, such measures would ensure that the requisite nexus existed between the sanction imposed and the particular claims at issue. Of course, we take no position on how such measures might impact the outcome on the merits, and the precise sanction imposed is ultimately up to the District Court in the first instance.

## IV. CONCLUSION

For the foregoing reasons, we will vacate the District Court's July 22, 2016 order that entered judgment in favor of DiRocco and held Bennett liable for the $737,018 breach of contract damages and the $44,320.50 monetary sanction. The case is remanded to the District Court for further proceedings consistent with this opinion.