**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1874
_____

IN RE: SOMERSET REGIONAL WATER
RESOURCES, LLC

LARRY L. MOSTOLLER; CONNIE J. MOSTOLLER,
                                                            Appellants
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 3:18-cv-00204)
District Judge: Honorable Marilyn J. Horan
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on November 14, 2019

Before: AMBRO, KRAUSE, and BIBAS, *Circuit Judges*

(Opinion Filed:  February 11, 2020)
_____

Aurelius P. Robleto
Robleto Law
Three Gateway Center
401 Liberty Avenue, Suite 1306
Pittsburgh, PA 15222
    *Counsel for Appellants*

Courtney S. Schorr
McGuireWoods
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222
    *Counsel for Appellee*

———————————

OPINION OF THE COURT

———————————

BIBAS, *Circuit Judge*.

When a lender insists on collateral, it expects the collateral to be worth something. Larry Mostoller's company was in bankruptcy and about to fold. Its largest creditor was willing to lend another $1 million to keep it afloat, but only if Mr. Mostoller pledged a forthcoming personal tax refund as collateral. Everyone who negotiated the deal expected that the refund would amount to roughly $1 million—the net amount owed to Mr. Mostoller based on his company's substantial 2015 losses, which he could use to offset his taxable income in 2013, 2014, and 2015.

But now that Mr. Mostoller has the loan and the tax-refund check, he urges a reading of the agreement that he never mentioned during negotiations: that he pledged as collateral his refund on taxes that he paid for 2015 *alone*, excluding any refund on his 2013 and 2014 taxes. Yet he admits that his reading would make the collateral worthless.

The bankruptcy court rightly rejected Mr. Mostoller's novel reading of the agreement. Its description of the collateral was ambiguous, so the court enforced it as the parties understood it: to produce a million-dollar refund. Without that security, the lender would never have made so risky a loan. And because Mr. Mostoller owned almost the entire refund separately from his wife, the court properly rejected his argument that his pledge was unenforceable without her consent. So like the District Court before us, we will affirm.

## I. BACKGROUND

### A. The bankruptcy

Mr. Mostoller solely owned Somerset Regional Water Resources, LLC (the Debtor), a water-transportation business that serviced oil and gas wells. The Debtor used to be profitable. But when oil prices plummeted in mid-to-late 2014, the oil and gas industry suffered. The Debtor and its customers were no exception. Its losses mounted and its balance sheet plunged into the red.

The Debtor's largest creditor was Somerset Trust Company, to which it owed more than $3 million. The Trust's loans were secured by a blanket lien on most of the Debtor's assets and a personal guarantee by Mr. Mostoller.

3

In late 2015, the Debtor faced a severe cash-flow shortage and the likely termination of one of its leases. To stop the bleeding, it voluntarily petitioned for reorganization under Chapter 11 of the Bankruptcy Code.

## B. The emergency loan, its collateral, and the default

Chapter 11 lets struggling companies reorganize so that they can exit bankruptcy, keep operating, and pay as much as possible to their creditors. *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 518 (3d Cir. 2005). But the Debtor faced a dire liquidity crisis; it stood little chance of surviving a Chapter 11 reorganization without an immediate cash infusion. And because the Debtor was overleveraged, it would find it hard to attract new lenders in what little time it had.

The Trust, however, had a unique incentive to lend more: if a new loan could keep the Debtor afloat, it would more likely be able to repay the Trust in full. Still, to encourage new lending, the Debtor would have to pledge to the Trust substantial new collateral. But the Debtor had already pledged most of its assets to the Trust as security; it had little left to offer.

Thus, the Debtor's management turned to Mr. Mostoller to see if he would pledge some personal assets to secure a loan to save his business. To entice the Trust to lend more money, the Debtor's Chief Restructuring Officer proposed that Mr. Mostoller "assign his interests in the net proceeds of [an anticipated] federal tax refund." 3 App. 1179.

A taxpayer is entitled to a refund if he pays more taxes than he has to. *See* 26 U.S.C. § 6402(a) (2012). And Mr. Mostoller had overpaid over several years. As an S Corporation, the

4

Debtor was a pass-through entity for tax purposes. *See* 26 U.S.C. §1363(a) (2012). Its taxable income and losses passed through to Mr. Mostoller, its sole owner. *See id.* §1366(a)(1)(A). He filed his taxes jointly with his wife in 2013, 2014, and 2015. In 2013 and 2014, when the Debtor was thriving, the Mostollers had paid millions of dollars in federal taxes on that income.

But by 2015, the business was struggling. Under a provision of the Internal Revenue Code in effect at the time, he could file amended 2013 and 2014 tax returns to carry back the Debtor's 2015 losses, which would offset his taxable income for those two years and trigger a refund. 26 U.S.C. §172(a), (b)(1)(A)(i) (2012), *repealed in relevant part by* The Tax Cuts and Jobs Act, Pub. L. No. 115-97, tit. I, §13302(b), 131 Stat. 2054, 2122 (2017). Because the Debtor had lost millions of dollars in 2015, the Debtor, the Trust, and their advisors expected that Mr. Mostoller would get a net tax refund of close to $1 million. And the parties understood that Mr. Mostoller could pledge this amount as collateral for an emergency loan.

In the hasty negotiations that followed, the parties reached an agreement. Mr. Mostoller was involved in the negotiations and signed the agreement. In paragraph 6 of that agreement, he pledged as collateral "any rights or interest in the 2015 Federal tax refund due to him individually, but attributable to the operating losses of the Debtor." 2 App. 56–57 ¶6. In exchange, the Trust would lend the Debtor $1 million.

Without that valuable collateral, the Trust would not have lent the Debtor more money. The tax refund was "a central part of [the] collateral package" and was "insisted upon by [the]

5

Trust." 3 App. 1068. But the agreement left open the details about executing the tax filings needed to trigger the expected refund. The parties expected that an accountant would handle these details later. Soon after the parties struck the deal, the bankruptcy court approved the agreement and entered it on its docket as a consent order (the Loan Order). 2 App. 51–75.

But even this cash infusion could not save the Debtor. It soon defaulted on the emergency loan. Without a new source of financing to keep the business afloat, the Debtor converted its bankruptcy from a Chapter 11 reorganization to a Chapter 7 liquidation.

## C. The tax-refund dispute

Right after the Debtor defaulted on the emergency loan, Mr. Mostoller tried to hang onto the collateral that he had pledged. At first, he apparently refused to file his 2015 tax return and amended 2013 and 2014 tax returns, which were needed to generate the tax refund. So the Trust moved to compel him to do that. At the hearing on this motion, Mr. Mostoller told the bankruptcy court that he had filed those tax returns. And he testified that he "agree[d] that [the] Trust gets half of the tax refund, minus the federal taxes due," with the other half going to his wife. 3 App. 969. The Trust later agreed to that proposal.

But when the tax refund came, Mr. Mostoller tried to keep all of it for himself. His accountant received the $1.12 million refund check from the IRS and followed the bankruptcy court's order by promptly depositing it with the court. Yet when the

Trust moved to claim Mr. Mostoller's share of the pledged collateral, he cross-moved, seeking the entire refund.

In briefing on those motions, Mr. Mostoller argued for the first time that paragraph 6 of the Loan Order was limited to any tax refund owed to him because of income offset in the 2015 tax year and did not include any refund from income offset in prior tax years. In the alternative, he argued that because he and his wife owned the refund as tenants by the entirety under Pennsylvania law, and because his wife had not signed the Loan Order, the Trust could not seize the refund proceeds.

In response, the Trust argued that paragraph 6 is ambiguous, that extrinsic evidence from the negotiations showed that refunds derived from offsetting the Mostollers' 2013 and 2014 income against the Debtor's 2015 losses were included, and that the Mostollers' property interests in the refund were separate. In support, the Trust submitted affidavits from the Trust's Senior Vice President, the Debtor's Chief Restructuring Officer, and a lawyer who helped the Debtor negotiate the emergency loan. Each affiant had taken part in the negotiations and maintained that paragraph 6 encompassed refunds derived from the offset of taxable income from prior years, not just from 2015. At an evidentiary hearing, each affiant testified to the same.

For his part, Mr. Mostoller maintained that paragraph 6 is unambiguous, though he chose at the last minute not to testify.

**D. Procedural history**

After supplemental briefing, the bankruptcy court held for the Trust on all grounds. *Somerset Tr. Co. v. Mostoller* (*In re Somerset Reg'l Water Res., LLC*), 592 B.R. 38 (Bankr. W.D. Pa. 2018). It credited the Trust's witnesses and the "overwhelming evidence" of the parties' intent in holding that "the deal was to pledge the entirety of the refund generated by the [Debtor's] 2015 operating losses." *Id.* at 62. So it read paragraph 6 of the Loan Order to include refunds from 2013 through 2015—that is, the full amount at issue. *Id.* at 57–60. It also rejected the Mostollers' claim that they owned the refund as tenants by the entirety, holding that under federal tax law their interests were divisible. *Id.* at 63–64. After factoring in the Trust's concession that Mrs. Mostoller could keep half of the refund, the bankruptcy court ordered the release of the remaining $536,894 held in escrow to the Trust. *See id.* at 60, 64. On appeal, the District Court affirmed.

The Mostollers now appeal to our Court. They raise three arguments: first, that the bankruptcy court lacked subject-matter jurisdiction to decide the dispute; second, that paragraph 6 of the Loan Order is unambiguously limited to the refund from only the 2015 tax year; and third, that they owned the whole $1.12 million refund as tenants by the entirety, so the Trust cannot seize any of those funds.

On appeal, "we 'stand in the shoes' of the District Court" and apply the same standard of review. *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 209 (3d Cir. 2011) (en banc) (quoting *IRS v. Pransky* (*In re Pransky*), 318 F.3d 536, 542 (3d Cir. 2003)). We review the bankruptcy court's legal determinations

de novo, its factual findings for clear error, and its discretionary decisions for abuse of discretion. *Schepis v. Burtch* (*In re Pursuit Capital Mgmt., LLC*), 874 F.3d 124, 133 n.14 (3d Cir. 2017). And because the bankruptcy court heard testimony from witnesses who participated in the negotiations, we give "due regard to the opportunity of that court to judge first-hand the[ir] credibility." *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1223 (3d Cir. 1995) (internal quotation marks omitted).

## II. THE BANKRUPTCY COURT HAD JURISDICTION TO DECIDE THE DISPUTE

The Mostollers argue that the bankruptcy court lacked subject-matter jurisdiction to decide the dispute over the tax refund. Bankruptcy courts have limited statutory jurisdiction under the Bankruptcy Code and limited constitutional jurisdiction under Article III. *Stern v. Marshall*, 564 U.S. 462, 473–74, 482 (2011). Unless the parties consent, bankruptcy courts have jurisdiction to enter final judgments only in "core proceedings." 28 U.S.C. § 157(b), (c)(1); *Stern*, 564 U.S. at 474–75; *see Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1949 (2015).

Here, the bankruptcy court entered a final judgment on the parties' cross-motions and ordered the Mostollers to give up half of the tax refund. They argue that the court exceeded its statutory and constitutional jurisdiction because the refund dispute is not a core proceeding. *See Stern*, 564 U.S. at 482 (analyzing Bankruptcy Code and Article III jurisdiction separately); *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 135–36 (3d Cir. 2019) (same). Not so.

9

First, the dispute falls within the bankruptcy court's statutory jurisdiction over core proceedings. While the bankruptcy court held that it had statutory jurisdiction under several provisions of 28 U.S.C. § 157(b)(2), we need discuss only one here. Section 157(b)(2)(D) confers jurisdiction over "orders in respect to obtaining credit." That is the issue here: the reach and scope of paragraph 6 of the Loan Order, a court-approved agreement that gave the Debtor a new loan. Because the Loan Order "authorized the agreement[ ] at issue in this case," the parties "assert[ ] rights that were established in connection with one of the [b]ankruptcy [c]ourt's core functions—here, the approval of [the Debtor's] requests for more credit." *KeyBank Nat'l Ass'n v. Franklin Advisers, Inc.*, 600 B.R. 214, 228 (S.D.N.Y. 2019) (citing 28 U.S.C. § 157(b)(2)(D)); *see also Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1245 n.1 (3d Cir. 1994) ("Post-petition transactions are more likely to be core proceedings.").

Second, because this dispute could have arisen only in bankruptcy, the bankruptcy court's exercise of jurisdiction did not offend Article III. *See Stern*, 564 U.S. at 499 (holding that a bankruptcy court's exercise of jurisdiction poses no constitutional problems if "the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process"). Without the court's Loan Order, the Debtor most likely could not have gotten the emergency financing it needed to try to survive Chapter 11 reorganization. And once the court entered the Loan Order, it "plainly had jurisdiction to interpret and enforce it[ ]" against its signatories, including Mr. Mostoller. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009). As a leading treatise recognizes, "[t]here has never

been any doubt" about bankruptcy courts' jurisdiction over "matters of administration," like entering and enforcing "orders in respect to obtaining credit." 1 *Collier on Bankruptcy* ¶3.02[3][a] (16th ed. 2019).

The bankruptcy court thus properly exercised core-proceeding jurisdiction over the tax-refund dispute under 28 U.S.C. § 157(b)(1)–(2). The District Court in turn had jurisdiction under 28 U.S.C. §§ 157(a) and 158(a). And we have jurisdiction under 28 U.S.C. §§ 158(d)(1) and 1291. Having settled this threshold issue, we proceed to the merits.

## III. THE BANKRUPTCY COURT RIGHTLY FOUND AMBIGUITY AND CONSTRUED IT IN FAVOR OF THE TRUST

The crux of this appeal is the phrase "the 2015 Federal tax refund due to [Mr. Mostoller] individually, but attributable to the operating losses of the Debtor" in paragraph 6 of the Loan Order. 2 App. 56–57 ¶6. The parties dispute whether that phrase is ambiguous and, if so, which side's reading controls. The Loan Order is a consent decree formalizing the parties' agreement, so we interpret it as a contract. *McDowell v. Phila. Hous. Auth.*, 423 F.3d 233, 238 (3d Cir. 2005). The parties agree that Pennsylvania law governs.

The bankruptcy court found that paragraph 6 is ambiguous because it is "subject to multiple reasonable interpretations." 592 B.R. at 52. After considering documentary evidence and credible testimony from the negotiators, it resolved that ambiguity by adopting the Trust's reading. It rejected the Mostollers' contrary reading, which it found would lead to

unreasonable results and which Mr. Mostoller never expressed throughout the loan negotiations. All of that reasoning is sound.

### A. Paragraph 6 of the Loan Order is ambiguous

Whether an agreement is ambiguous is a question of law, so we review de novo. *Pacitti ex rel. Pacitti v. Macy's*, 193 F.3d 766, 773 (3d Cir. 1999) (applying Pennsylvania law). Under Pennsylvania law, "[a] contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Schwab v. Pennsummit Tubular, LLC* (*In re Old Summit Mfg., LLC*), 523 F.3d 134, 137 (3d Cir. 2008) (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986)). Paragraph 6 is ambiguous because it is subject to at least three reasonable, competing readings:

First, "2015 Federal tax refund" could mean a tax refund paid to the Mostollers in the 2015 calendar year. Natural persons generally must use the calendar year as their tax year and do not file their tax returns until the next year. *See* 26 U.S.C. §441(g) (2012). So a tax refund issued in 2015 would be for the 2014 tax year. None of the parties urges us to adopt this reading, but it is reasonable on its face.

Second, that phrase could mean a refund received at any time on only the Mostollers' 2015 taxes (which they paid later on), triggered by the Debtor's losses in the 2015 tax year. The Mostollers urge us to adopt this reading. And the bankruptcy court agreed that it was reasonable on its face. Because the Debtor's profits were their chief source of income, and the

12

parties expected the Debtor to incur millions of dollars in losses in 2015, this reading would produce a relatively small tax refund.

Third, paragraph 6 could refer to a tax refund owed to the Mostollers because of the Debtor's 2015 losses, even if the Mostollers used those losses to offset their 2015 income and income from past years. In other words, the phrase "2015 Federal tax refund … attributable to the operating losses of the Debtor" might refer to *any refund* paid because of losses that the Debtor incurred in 2015. 2 App. 56–57 ¶6. The Trust advances this reading. And the bankruptcy court agreed that it was reasonable on its face too. That reading would include refunds owed because of the Debtor's multi-million-dollar losses in 2015, which the Mostollers could use to offset their taxable income from 2015 as well as from 2013 and 2014 (the two years within the carryback period). *See* 26 U.S.C. §172(b)(1)(A)(i) (2012).

Because paragraph 6 is subject to each of these reasonable, competing readings, we agree with the bankruptcy court that it is ambiguous.

### B. The Trust's reading best resolves that ambiguity

To resolve a contract's ambiguity, we look to extrinsic or parol evidence—that is, "[e]vidence relating to a contract but not appearing on the face of the contract because it comes from other sources, such as statements between the parties or the circumstances surrounding the agreement." *Extrinsic Evidence*, *Black's Law Dictionary* (11th ed. 2019). Whether the ambiguity is patent or latent, we may look to parol evidence all the

13

same. *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (citing *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004)). And we may use parol evidence "to show both the intent of the parties and the circumstances attending the execution of the contract." *Osial v. Cook*, 803 A.2d 209, 214 (Pa. Super. Ct. 2002).

We now turn to the bankruptcy court's reading of the parol evidence. "[T]he resolution of conflicting parol evidence" is a question of fact that we review for clear error. *In re Old Summit*, 523 F.3d at 137 (quoting *Hutchison*, 519 A.2d at 390). The bankruptcy court found that the parol evidence of the parties' intent "overwhelming[ly]" favors the Trust's reading. 592 B.R. at 62. We agree.

1. *The parol evidence of the Loan Order negotiations.* The Trust submitted affidavits and later live testimony from three witnesses who helped negotiate the loan: the Trust's Senior Vice President, the Debtor's Chief Restructuring Officer, and a lawyer for the Debtor. We defer to the bankruptcy court's finding that each of these witnesses was credible. *Fellheimer*, 57 F.3d at 1223. Their testimony about the negotiations made three things clear:

First, without valuable new collateral, the Trust would not have lent the Debtor more money. That makes sense. Because of the Debtor's financial distress, it was at great risk of default. To secure such a risky loan, someone needed to put up valuable new collateral.

Second, everyone expected that, after offsetting other tax-related liabilities, Mr. Mostoller could pledge close to $1 million of his tax refund as collateral. This understanding was

14

based on preliminary estimates from an accountant who had prepared the Debtor's and the Mostollers' taxes. Given the fast pace of negotiations, those estimates were the best the parties could get.

Third, the parties chose not to specify the details of how they would execute filing the Mostollers' new and amended tax returns. Because the negotiations were moving so fast, they left those specifics to a professional accountant. So neither the negotiations nor the Loan Order touched on *how* the Debtor's 2015 losses would create a refund. But all the parties expected that the resulting refund would be worth around $1 million. Thus, the parties understood that the "2015 refund" referred generally to any refund generated by the Debtor's 2015 losses.

2. *The Trust's reading tracks the actual refund.* Only the Trust's reading squares with this extrinsic evidence. The Trust reads the key phrase to mean any tax refund owed to Mr. Mostoller because of losses incurred by the Debtor in 2015, even if those losses produced further and larger refunds after being carried back to the 2013 and 2014 tax years. Otherwise, the eventual tax refund would fall far short of the parties' expectations. To show how, we must reconstruct the Mostollers' tax filings for those three years.

a. *Tax year 2015.* In 2015, the Debtor incurred roughly $6.3 million in losses, dwarfing the Mostollers' other taxable income. Because it was a pass-through entity, Mr. Mostoller claimed the Debtor's losses on his and his wife's joint personal tax return. After factoring in these losses, the Mostollers paid zero taxes for the 2015 tax year. Because these losses more than offset their other taxable income, they got a refund of

about $126,000 for that year. The Mostollers ask us to stop there; the Trust urges us to march on.

After satisfying other tax-related obligations, around $4.9 million of the Debtor's 2015 net operating losses remained. At the time, the Internal Revenue Code let the Mostollers use those leftover losses to offset taxable income in the two preceding tax years: 2013 and 2014. *See* 26 U.S.C. § 172(b)(1)(A)(i) (2012). So march on we must, back to 2013 first. *See id.* § 172(b)(2) (requiring taxpayers to carry losses back "to the earliest of the taxable years" available under § 172(b)(1)(A)(i)).

b. *Tax year 2013*. In 2013, the Debtor was making money and the Mostollers had about $490,000 in taxable income. Carrying back the Debtor's 2015 losses on an amended tax return, the Mostollers were entitled to a refund of about $143,000 for that tax year. That brought their total refund to roughly $269,000. Still, more than $4.4 million of the Debtor's 2015 losses were left to carry over to the 2014 tax year.

c. *Tax year 2014*. In 2014, the Debtor thrived. The Mostollers earned more than $7.3 million and paid about $2.9 million in federal income taxes. Through another amended tax return, the Mostollers used the Debtor's remaining 2015 losses to offset more than half of their 2014 income. That produced a refund of roughly $1.8 million, bringing the total gross refund to just over $2 million.

d. *Adding it all up*. The IRS subtracted roughly $900,000 in other tax obligations from those refunds. Ultimately, the Mostollers got a tax-refund check of about $1.12 million,

16

which matched the parties' expectations when they executed the Loan Order. But if paragraph 6 referred to a refund on taxable income earned during the 2015 tax year alone, the refund would have fallen well short of those expectations. Only through the amended 2013 and 2014 tax returns could the refund reach the anticipated size, one large enough to secure the million-dollar emergency loan. So only the Trust's reading of paragraph 6 tracks the Mostollers' actual refund, as anticipated by extrinsic evidence of the parties' intent.

3. *The Mostollers' reading of paragraph 6 fails.* By contrast, the parol evidence contradicts the Mostollers' reading, which limits the phrase "2015 Federal tax refund" to a refund of only their 2015 taxes and excludes refund proceeds from 2013 and 2014. As noted, that reading of paragraph 6 would have foreseeably produced a refund too small to induce and secure the risky loan.

Worse still, the Mostollers admit that under their reading, the agreed-upon refund "would be valueless." Appellants' Br. 4; *accord id.* at 15. Their other tax obligations would swallow up the 2015-only refund, leaving no value in the collateral to secure the emergency loan. It strains credulity to think that such evidently worthless collateral would have enticed the Trust to make so risky a loan. We reject this commercially unreasonable reading. *See Starling v. Lake Meade Prop. Owners Ass'n*, 162 A.3d 327, 345 (Pa. 2017) (noting the "prohibition on any interpretation" of a contract "that leads to an absurd result").

To be clear, we do not let parol evidence about ethereal expectations trump the text. Here, the text itself is ambiguous and

is open to several reasonable readings. And "the extrinsic evidence proffered by [the Trust] concerns the parties' objectively manifested linguistic reference regarding certain terms of the contract, rather than merely their [subjective] expectations." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 99 (3d Cir. 2001). Thus, the parol evidence helps us to resolve ambiguity, not to create ambiguity where none exists.

In sum, the Trust's reasonable reading tracks the parol evidence that the bankruptcy court found credible. And the Mostollers' reading conflicts with both the parties' understanding and basic commercial sense. So we will affirm the bankruptcy court's reading.

### C. The bankruptcy court rightly rejected the Mostollers' unexpressed reading

Even if the Mostollers' reading better tracked the extrinsic evidence, we would still affirm on another ground. The bankruptcy court rightly applied the "central principle of contract interpretation that if a party knew or had reason to know of the other parties' interpretation of terms of a contract, the first party should be bound by that interpretation." *Bohler-Uddeholm*, 247 F.3d at 97, 99 (applying Pennsylvania law); *accord* Restatement (Second) of Contracts § 201(2)(b) (Am. Law Inst. 1981).

During the negotiations, the Debtor's and the Trust's representatives repeatedly put Mr. Mostoller on notice that they read paragraph 6 as requiring him to pledge around $1 million of the tax refund as collateral for the emergency loan. But Mr. Mostoller never told them of his contrary reading

18

at the time. He kept them in the dark until after the Trust had relied on the collateral to extend a risky loan. By then it was, as the Mostollers aptly put it, "too late." Appellants' Br. 4.

To prevent a silent party from later ambushing his unwitting opponents, we reject the silent party's unexpressed reading. *See, e.g.*, *Bohler-Uddeholm*, 247 F.3d at 99; *Emor, Inc. v. Cyprus Mines Corp.*, 467 F.2d 770, 775–76 (3d Cir. 1972) (applying Pennsylvania law). We agree with the bankruptcy court that Mr. Mostoller is "seeking to take advantage of both sides of the coin." 592 B.R. at 62. So the court was right to apply this doctrine here.

## IV. THE MOSTOLLERS' INTERESTS IN THE 2015 TAX REFUND ARE SEPARATE

In a last-ditch effort to keep the collateral, the Mostollers argue that they owned the tax refund as tenants by the entirety under Pennsylvania law. If that is right, then the Trust could not seize those funds because only Mr. Mostoller, not Mrs. Mostoller, signed the Loan Order. "Pursuant to Pennsylvania law, property owned as tenants by the entirety cannot be accessed by the creditors of only one spouse." *Clientron Corp. v. Devon IT, Inc.*, 894 F.3d 568, 575 (3d Cir. 2018).

But Pennsylvania law is only part of this equation. It is federal tax law that determines who owns what portion of a federal tax refund and how they own it. And federal tax law provides that spouses' ownership of a refund depends on how they owned the income that generated that refund under state property law.

19

Under Pennsylvania law, the Mostollers held separate interests in the Debtor's income because Mr. Mostoller alone owned the Debtor. So the Mostollers' interests in the refund were separate too. And they never merged those separate interests into entireties interests. Thus, the bankruptcy court rightly rejected this argument.

### A. Federal tax refunds are separately owned if the income is separately owned

As we shall explain, a mixture of federal and state law governs ownership of federal tax refunds. We discuss each in turn.

1. *Federal tax law*. The Internal Revenue Code does not automatically treat refunds from joint marital returns as jointly owned. Rather, each spouse owns a portion of the refund separately, according to his or her share of the tax overpayment. *See* 26 U.S.C. § 6402(a) (2012) (authorizing the IRS to "credit the amount of [any] overpayment … against any [tax] liability … *on the part of the person who made the overpayment* and … [to] refund any balance to such person" (emphasis added)). So the ownership of the spouses' income determines how they own a tax refund on that income. If the income is separate going in, then the refund is separate coming out. Merely filing a joint tax return does not change that.

Our sister circuits concur. The Fifth Circuit, for instance, has held that if the income leading to a tax overpayment belongs to one spouse, then, even if the two file a joint tax return, the refund does not belong jointly to both spouses. *Ragan v. Comm'r*, 135 F.3d 329, 333 (5th Cir. 1998). As Judge Higginbotham explained for the court, "[a] joint income tax

20

return does not create new property interests for the husband or wife in each other's income tax overpayment." *Id.* Because the income was the husband's alone under Texas law, the wife had no interest in the resulting refund. *Id.*

Nor is the Fifth Circuit alone. In the words of the Ninth Circuit: "A joint return does not itself create equal property interests for each party in a refund. Spouses who file a joint return have *separate* interests in any overpayment, the interest of each depending upon his or her relative contribution to the overpaid tax." *United States v. Elam*, 112 F.3d 1036, 1038 (9th Cir. 1997). Thus, "fil[ing] a joint tax return … does not change the underlying property interests at stake." *Id.*; *see also Callaway v. Comm'r*, 231 F.3d 106, 117 (2d Cir. 2000) ("[T]he filing of a joint return does not have the effect of converting the income of one spouse into the income of another." (citing *McClelland v. Massinga*, 786 F.2d 1205, 1210 (4th Cir. 1986)); *Gordon v. United States*, 757 F.2d 1157, 1160 (11th Cir. 1985) ("Where spouses claim a refund under a joint return, the refund is divided between the spouses, with each receiving a percentage of the refund equivalent to his or her proportion of the withheld tax payments."); *cf.* Rev. Rul. 74-611, 1974-2 C.B. 399, 399 ("Court decisions have consistently held that a husband and wife who file a joint return do not have a joint interest in an overpayment; each has a separate interest.").

We now join our sister circuits in adopting this rule. Thus, when the Mostollers got their refund check, each spouse acquired a separate interest in it proportional to his or her contribution to the overpayments. If the income was jointly owned, then the Mostollers had a common interest in the

21

refund. But if it was separately owned by Mr. Mostoller, then his wife had no interest in the refund when it arrived.

To figure out who owned what (and how), we turn to Pennsylvania law. *See United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 722 (1985) ("[S]tate law controls in determining the nature of the legal interest which the taxpayer had in the property. … [F]ederal statute[s] create[] no property rights but merely attach[] consequences, federally defined, to rights created under state law." (internal quotation marks omitted)).

2. *State property law*. Under Pennsylvania law, Mr. Mostoller owned most of the spouses' income in 2013, 2014, and 2015, because he separately owned the main producer of that income: the Debtor. So he also owned most of the refund when it arrived.

In Pennsylvania, spouses ordinarily own property in one of three ways: separately, as tenants in common, or as tenants by the entirety. In the first, only one spouse owns the property; the other does not. The second means that each spouse possesses the property but has "separate and distinct" legal title to it. *In re Estate of Quick*, 905 A.2d 471, 474 (Pa. 2006). And the third gives each spouse a joint, singular interest in " 'the whole or the entirety,' and not a 'share, moiety or divisible part' " of the property. *Clientron Corp.*, 894 F.3d at 579 (quoting *In re Brannon*, 476 F.3d 170, 173 (3d Cir. 2007)). Creditors of one spouse can attach separate or common interests of that spouse, but they cannot attach jointly held entirety interests without the other spouse's consent. *See id.* at 575. To win, the Mostollers must show that they owned their income as tenants by the entirety.

For a tenancy by the entirety, Pennsylvania requires the traditional common-law elements: a marriage, plus the "four unities" of time, title, possession, and interest. *In re Estate of Quick*, 905 A.2d at 474. To satisfy those unities, the spouses must (1) have their interests "vest at the same time," (2) "obtain[] their title by the same instrument," (3) have "an undivided interest in the whole," and (4) own interests "of the same type, duration and amount." *In re Estate of Rivera*, 194 A.3d 579, 586–87 (Pa. Super. Ct. 2018) (quoting *Fenderson v. Fenderson*, 685 A.2d 600, 607 (Pa. Super. Ct. 1996)).

Here, none of the unities was present. Because Mr. Mostoller was the Debtor's sole owner, he alone had legal title to, possession of, and an interest in its income when it accrued. Thus, he owned that income as separate property. As the Mostollers had no other significant source of income, the Debtor accounted for the lion's share of their taxable income from 2013 to 2015. So under federal tax law, Mr. Mostoller owned most of the refund separately.

## B. The Mostollers never merged their separate interests into entireties interests

After spouses get a refund, they can change their ownership of that money under state property law. For instance, spouses can merge their separate interests into entireties interests over time, as long as they satisfy the four unities needed for a tenancy by the entirety. *Cf. In re Estate of Brose*, 206 A.2d 301, 304 (Pa. 1965). But when the IRS issued the Mostollers' refund check, Mr. Mostoller owned almost all of it separately through his sole ownership of the Debtor's income, even though the check was made out to both spouses. While the unities of time

and title were satisfied by then, the unities of possession and interest were still missing. *See In re Estate of Rivera*, 194 A.3d at 586. And the Mostollers could not have merged their interests: their accountant immediately deposited the refund check with the bankruptcy court before they could commingle the proceeds.

Because their interests both started and remained separate, Mr. Mostoller validly pledged his share on his own. Thus, the bankruptcy court properly ordered the Mostollers to turn over half of the refund to the Trust.

* * * * *

Now that he has his loan, Mr. Mostoller wants to water down his pledge. He admits that, on his novel reading of the loan agreement, the promised collateral "would be valueless." Appellants' Br. 4. But the bankruptcy court rightly found that the Loan Order's description of the collateral was ambiguous and that the Trust's reading tracked the parties' understanding. It also rightly held that, under federal tax law, the Mostollers owned the tax refund separately, so Mr. Mostoller alone could pledge it. Finally, in doing so, it properly exercised its jurisdiction over core proceedings. The District Court affirmed in all respects. So too will we.