**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 20-3485, 20-3486, 20-3487, 20-3488
_____

In re: IMERYS TALC AMERICA, Inc.,

a/k/a Luzenac America, Inc.

a/k/a Imerys Talc Ohio Inc.

a/k/a Imerys Talc Delaware, Inc., et al., Debtors


Cyprus Historical Excess Insurers,

Appellants


_____


On Appeal from the United States District Court for the
District of Delaware
(Case Nos. 1:19-cv-944, 1:19-cv-1120, 1:19-cv-1121, 1:19-
cv-1122)
District Judge: Hon. Maryellen Noreika
_____

Argued October 5, 2021

Before: KRAUSE, BIBAS, and RENDELL, *Circuit Judges*

(Opinion Filed: June 30, 2022)

Tancred V. Schiavoni
Anton Metlitsky [Argued]
O'MELVENY & MYERS LLP
Times Square Tower, 7 Times Square
New York, NY 10036

*Counsel for Cyprus Historical Excess Insurers*

Jeffrey E. Bjork
Amy C. Quartarolo
Helena G. Tseregounis
LATHAM & WATKINS LLP
355 South Grand Avenue
Suite 1000
Los Angeles, CA 90071

Roman Martinez [Argued]
Caroline A. Flynn
Gregory B. in den Berken
LATHAM & WATKINS LLP
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C. 20004

Michael J. Merchant
Marcos A. Ramos
Amanda R. Steele
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
        *Counsel for Imerys Talc America, Inc., Imerys Talc*
        *Vermont, Inc., and Imerys Talc Canada Inc.*

Robert S. Brady
Edwin J. Harron [Argued]
Sara Beth A.R. Kohut
Catherine C. Lyons
Sharon M. Zieg
YOUNG CONAWAY STARGATT & TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
        *Counsel for Future Claimants Representative*

Robert J. Schneider, Jr.
OFFICE OF UNITED STATES TRUSTEE
1085 Raymond Boulevard

2

One Newark Center, Suite 2100
Newark, NJ 07102

Dana Kaersvang
UNITED STATES DEPARTMENT OF JUSTICE
Room 7209
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
*Counsel for Amicus Curiae United States Trustee
Region 3*

_____

OPINION OF THE COURT

_____

KRAUSE, *Circuit Judge.*

A group of insurance companies[1] appeals an order appointing a representative for the interests of unidentified future asbestos and talc claimants in an ongoing bankruptcy proceeding. According to these insurers, who fund the asbestos claims trust established under 11 U.S.C. § 524(g), this "future claimants' representative" ("FCR") has a conflict of interest precluding him from serving in this role because the FCR's law firm also represented two of the insurance companies in a separate asbestos-related coverage dispute. But the Bankruptcy Court did not abuse its discretion in appointing the FCR. In applying in substance the appointment standard we adopt today, it gave due consideration to the purported conflict, and it correctly determined that the interests of both

---

[1] The Appellants in this case—collectively, "the Insurers"—are various insurance companies that had issued policies to Imerys or its predecessors, and thus that have an interest in Imerys's reorganization process. They are: Columbia Casualty Company, Continental Casualty Company, the Continental Insurance Company ("Continental"), Lamorak Insurance Company, Berkshire Hathaway Specialty Insurance Company, and National Union Fire Insurance Company of Pittsburgh, PA ("National Union").

the insurance companies and the future claimants were adequately protected. We therefore will affirm.

## I. BACKGROUND

We focus today on the appointment and conflicts standard for an FCR. But because the history and purpose of the so-called "524(g) trust" provides necessary context for our analysis, we begin with a brief historical overview before recounting the factual and procedural history of this case.

### A. Historical Background

Appellees Imerys Talc America, Inc., Imerys Talc Vermont, Inc., and Imerys Talc Canada Inc. (collectively, "Imerys") are among the latest in a long line of companies to turn to the bankruptcy process in response to the crushing liability imposed by mounting asbestos and talc personal injury claims. *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 200-01 (3d Cir. 2004).

Asbestos liabilities pose particular challenges for bankruptcy proceedings: While Chapter 11 bankruptcy reorganization normally affects only the rights of a debtor's current creditors and equity holders, many of the claimants who will suffer harm from asbestos exposure traceable to the debtor will not manifest those injuries until long after the reorganization process has concluded. Yet one of the primary goals for a debtor entering Chapter 11 bankruptcy is to cleanly resolve its various liabilities to preserve the going concern of its business. For that reason, a reorganization plan that failed to account for future asbestos liabilities would be of limited utility to the debtor, and likewise, a reorganization plan that did not address future claimants would fail to provide adequately for all parties with an interest in the debtor's assets.

When the once-dominant American producer of asbestos, the Johns-Manville Corporation, filed for bankruptcy in 1982, its reorganization process introduced a novel mechanism for dealing with these issues: a trust designed to compensate present and future asbestos claimants, coupled with an injunction against future asbestos liability. H.R. REP. NO. 114-352, at 5 (2015); *In re Fed.-Mogul Glob., Inc.*, 684

4

F.3d 355, 359 (3d Cir. 2012). The combination of the trust and injunction allowed the debtor to emerge from bankruptcy without the uncertainty of future asbestos liabilities hanging over its head, while ensuring claimants would not be prejudiced just because they had not yet manifested injuries at the time of the bankruptcy. Another major asbestos company, UNR Industries, soon "follow[ed] Johns-Manville's lead" and deployed a similar trust and injunction in its own bankruptcy plan. H.R. REP. NO. 103-835, at 40 (1994).

In 1994, Congress opted to follow the Manville/UNR model by amending the Bankruptcy Code to include 11 U.S.C. § 524(g), which "allow[s] for the resolution of asbestos liability claims against a debtor through a trust-based system." H.R. REP. NO. 114-352, at 5. That section allows the debtor to establish a trust that will serve as the exclusive source of compensation for any present and future asbestos mass-tort claimants after the confirmation of the reorganization plan. *Id.*; 11 U.S.C. § 524(g)(2)(B)(i). Provided that the trust meets certain statutory requirements, the bankruptcy court issues to the debtor a channeling injunction, which prevents any plaintiff from suing the reorganized debtor for liability based on exposure to asbestos or asbestos-containing products, *id.* § 524(g)(1)(B), and "channel[s] all current and future claims based on the debtor's asbestos liability to [the] trust," *Fed.-Mogul Glob.*, 684 F.3d at 357.

But the mere establishment of the trust and channeling injunction is not enough. In any asbestos-driven bankruptcy proceeding, there are naturally conflicting interests within the larger group of asbestos claimants with respect to the trust. Those who are presently injured—i.e., those who can make a claim on the trust now or within the foreseeable future—are indifferent to whether the trust pays out on fraudulent claims, because the funds are unlikely to be exhausted before they receive their own payouts. If anything, they may prefer a less onerous claims review process in order to maximize the speed with which they can recover against the trust. By contrast, those who will not manifest injuries for years down the line— the future claimants—have a strong interest in intensifying the trust's protections against fraudulent claims and early overpayments, as they need the trust's funds to last until they can submit their own claims. *See generally In re Amatex*

5

*Corp.*, 755 F.2d 1034, 1042–43 (3d Cir. 1985) (discussing the particular interests of future claimants in asbestos bankruptcy proceedings and concluding that their interests were "adverse" to those of other parties).

In light of this natural adversity and to protect the due process rights of the future claimants in bankruptcy proceedings, § 524(g) includes a requirement that the bankruptcy court appoint "a legal representative for the purpose of protecting the rights of [future claimants]"—the FCR—in the reorganization proceedings in order for the trust and channeling injunction to "be valid and enforceable." 11 U.S.C. § 524(g)(4)(B), 524(g)(4)(B)(i); *see also* H.R. REP. NO. 114-352, at 10. The FCR can then participate in the negotiation of the reorganization plan and object to terms that unfairly disadvantage future claimants.

The Bankruptcy Code is silent, however, on exactly what standard and process the bankruptcy court should use in appointing the FCR. As described next, it is that silence and the uncertainty it has engendered that have led to the current appeal.

### B.    Factual and Procedural Background

Like asbestos, talc exposure has generated a flood of personal injury claims over recent years, subjecting many talc companies to crushing liability. The experience of Imerys, a company that mined, processed, and distributed talc to third-party manufacturers for use in their products, is no exception. Although for many years it was able to tackle the talc claims as they arose using a combination of insurance assets and free cash flow, by the time it filed for bankruptcy in early 2019, it had been sued by over 14,000 claimants and could no longer afford to fight the growing mountain of claims. It therefore turned to Chapter 11 bankruptcy with the goal of channeling the numerous talc claims into a § 524(g) trust.

6

As has become a relatively common practice among debtors,[2] Imerys began work in preparation for its Chapter 11 bankruptcy proceedings months before actually filing its petitions.  In late 2018, as part of that preparation, it engaged James Patton, a partner at the law firm of Young, Conaway, Stargatt & Taylor, LLP (Young Conaway), to serve as "Proposed FCR" in prepetition negotiations.  Patton, in turn, retained Young Conaway as his counsel.

Both Patton and his firm had much experience in this area.  Patton had worked for decades on mass-tort bankruptcy matters, served as an FCR for several bankruptcy cases and post-bankruptcy settlement-trusts, and was recognized for his competence and expertise in these matters by bankruptcy courts and his colleagues.  He was one of a relatively small number of experienced FCRs in this specialized field.  *See* Lloyd Dixon *et al.*, *Asbestos Bankruptcy Trust: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts*, RAND Inst. For Civ. Just., at App. B (listing the FCRs for several of the largest active trusts and proposed trusts as of 2010).  Young Conaway, too, had represented FCRs in similar bankruptcies.

The engagement letter Patton signed with Imerys specified that, notwithstanding Imerys's obligation to pay his fees and costs, his "sole responsibility and loyalty [was] to the future personal injury claimants[.]"  JA 184.  Additionally, because the selection and appointment of an FCR is ultimately

---

[2] Prepetition work can be beneficial to enable the debtor to enter bankruptcy court having already engaged in many of the negotiations that will lead to a bankruptcy plan, or even enter with a "prepackaged" bankruptcy plan ready to file, saving costs and time in court and clearing Chapter 11 sooner.  *See United Artists Theatre Co. v. Walton*, 315 F.3d 217, 224 n.5 (3d Cir. 2003) (explaining the process and utility of "prenegotiated" and "prepackaged" bankruptcies).  As such, we have cautiously endorsed this practice, while requiring that the bankruptcy court carefully scrutinize the prepetition activity of the parties and counsel once the petitions have been filed.  *See In re Congoleum Corp.*, 426 F.3d 675, 693 (3d Cir. 2005).

left to the bankruptcy court, not the parties, 11 U.S.C. § 524(g)(4)(B)(i), the engagement letter provided that Patton's service as Proposed FCR would terminate immediately upon Imerys filing a bankruptcy petition, that Imerys would suggest to the Bankruptcy Court that Patton serve as FCR, and that the Bankruptcy Court would need to appoint him FCR if his work was to continue beyond the bankruptcy filing.

In February 2019, following several months of prepetition negotiations, Imerys filed its bankruptcy petitions in the Bankruptcy Court, followed by a motion for the Bankruptcy Court to appoint Patton as FCR. That motion was accompanied by a declaration from Patton and a copy of his prepetition engagement letter. The declaration set out a list of "potentially interested parties" in the Imerys bankruptcy— including "insurers"—and asserted that "*except* as set forth in this Declaration," Patton lacked any connection to the potentially interested parties. JA 157 (emphasis added).

One of the exceptions that Patton listed was that "Young Conaway represents [many insurance companies, including Appellant] National Union Fire Insurance Company of Pittsburgh, PA . . . in insurance coverage disputes that relate to environmental liabilities including asbestos claims but unrelated to talc claims or the Debtors." JA 158. Specifically, two of the Appellant Insurers—National Union and Continental—were party to *Warren Pumps v. Century Indemnity Co.*, No. N10C-06-141 (Del. Super. Ct.), in which two pump makers sued their insurers to get coverage for asbestos-related injury claims. At the time Patton made his disclosure, that litigation had been ongoing in the Superior Court of Delaware since June 2010, *see Viking Pump, Inc. v. Century Indem. Co.*, 2018 WL 2331990, at *1-2 (Del. Super. Ct. May 23, 2018), with Young Conaway representing both Continental and National Union. Patton's disclosure was also echoed in the declaration of another Young Conaway partner that was attached to Patton's motion for appointment of the firm as his counsel.

Notwithstanding the disclosures in these declarations, when the deadline for objections to Patton's proposed appointment arrived on March 13, 2019, none of the Insurers raised those representations as an objection. Nor did they

8

reference the *Warren Pumps* litigation or raise any concerns with Patton's application to retain Young Conaway. Rather, a group of five of Imerys's insurers filed a limited objection to Patton's employment based on his prepetition engagement as Proposed FCR, which they contended raised questions about his independence from Imerys. For its part, the U.S. Trustee argued that the Bankruptcy Court should not give any deference to Patton as the debtor's nominee and instead should hold a hearing to consider a broader pool of candidates.

The Insurers also failed to raise Young Conaway's involvement in the *Warren Pumps* litigation a month later at the Bankruptcy Court's hearing on Patton's appointment, which addressed both of the objections and related discovery disputes. Indeed, even though the objecting Insurers' attorney who cross-examined Patton at the hearing was himself involved in the *Warren Pumps* litigation and thus well aware of Young Conaway's involvement, he focused his questions on other bases for the Insurers' objections. To the extent *Warren Pumps* was referenced at all, it was only obliquely and briefly—with Patton confirming on cross-examination that: (1) Young Conaway represented National Union and Continental, among other insurance companies, (2) both companies had signed conflicts waivers as part of that representation, and (3) the National Union representation concerned insurance coverage for environmental liabilities including asbestos claims.

Instead, it was the Bankruptcy Court that flagged the *Warren Pumps* representation as a potential conflict. In its initial ruling on Patton's appointment on May 8, 2019, the Court disagreed with the objecting Insurers that Patton's prepetition work necessarily undermined his independence as FCR, but it expressed concerns about Patton's personal involvement in Young Conaway's previously disclosed representation of "Certain Excess Insurance companies in insurance coverage litigation related to environmental liabilities, including asbestos liabilities." JA 32. In resolving the motion, the Court articulated its view of the requirements for FCR appointments: "[T]he standard for approval of a legal representative under section 524 is that he must be independent of the debtors and other parties-in-interest in the case and must be able to act with undivided loyalty to demand holders." JA

33. The Court therefore sought to reassure itself of Patton's independence by directing Patton to file supplemental disclosures, postponing a final decision on his appointment.

Patton complied, and his supplemental disclosures revealed that, as part of Young Conaway's engagement letter with the insurance companies in the *Warren Pumps* litigation, those companies agreed to a prospective waiver for certain conflicts of interest that might arise out of Young Conaway's bankruptcy-related work. The disclosures also confirmed that Young Conaway had taken the precautionary step of erecting an ethical wall between Patton's FCR team and the firm's other insurance litigation.

Ironically, it was only upon receipt of this reassurance[3] that the Insurers, for the first time, objected to Patton's appointment based on the purported *Warren Pumps* conflict.[4] On May 17, 2019—ten days after the Court's initial ruling and over two months after the deadline for objections—they filed a "supplemental objection," arguing that Young Conaway's representation of Continental and National Union presented a

---

[3] Patton submitted an initial disclosure on May 13, 2019, followed by a second disclosure on May 17, 2019 with more detail on the terms of the conflict waiver and the details of Young Conaway's ethical wall.

[4] This was not the same combination of insurers as that which filed the original objection; the five original companies were joined for this later objection by National Union (one of the two points of overlap between the Appellant Insurers and the companies involved in *Warren Pumps*), and it is this group of six Insurers that now brings the instant appeal.

And, although the Insurers' Corporate Disclosure Statement submitted to this Court includes a seventh company, Lexington Insurance Company, that company is not actually a party to this appeal and, in fact, never seems to have been a part of the shifting group of insurers raising objections to Patton's appointment at any point in the Bankruptcy Court proceedings. The company also seems to have been inappropriately included in the Insurers' initial appeal to the District Court.

concurrent conflict of interest that precluded Patton's appointment. JA 939.

That filing did not sit well with the Bankruptcy Court. The Court took a dim view of the Insurers' supplemental objection as "both confusing and largely irrelevant to the issues actually presented by the Supplemental Declarations, and for that matter, Mr. Patton's original declaration." JA 35 (footnotes omitted). Nevertheless, it went on to address, and ultimately to reject, the merits of the Insurers' arguments. Based on the language of the prospective conflicts waiver and the sophistication of the signatories, the Court concluded the waiver was valid and precluded the Insurers' latest objections. And upon consideration of Patton's supplemental disclosures, it concluded that that Patton met the appointment standard described in its previous ruling. Thus, on June 3, 2019, the Court formally appointed Patton to the FCR position and authorized him to retain Young Conaway.

The District Court affirmed, and the Insurers appealed to this Court.

## II. JURISDICTION AND STANDARD OF REVIEW

This case was before the Bankruptcy Court as a core proceeding pursuant to 28 U.S.C. § 157(b), and the District Court had jurisdiction under 28 U.S.C. § 158(a). We have jurisdiction pursuant to 28 U.S.C. § 158(d)(1).

In our review of the Bankruptcy Court's decision, "'we stand in the shoes of the District Court' and apply the same standard of review." *In re Somerset Reg'l Water Res., LLC*, 949 F.3d 837, 844 (3d Cir. 2020) (quoting *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 209 (3d Cir. 2011) (en banc)). Thus, "our review duplicates that of the district court and we view the bankruptcy court decision unfettered by the district court's determinations." *In re Brown*, 951 F.2d 564, 567 (3d Cir. 1991) (citing *Universal Mins., Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101–03 (3d Cir. 1981)). Like the District Court, then, "[w]e review the bankruptcy court's legal determinations de novo, its factual findings for clear error, and its discretionary decisions for abuse of discretion." *Somerset Reg'l Water Res.*,

11

949 F.3d at 844 (citing *In re Pursuit Cap. Mgmt., LLC*, 874 F.3d 124, 133 n.14 (3d Cir. 2017)).

## III. DISCUSSION

The Insurers challenge the merits of the Bankruptcy Court's decision to appoint Patton FCR. But before we can reach that question, we must address two threshold issues in this appeal: the Insurers' standing to bring this challenge, and their waiver of their particular objection to Patton's appointment. After disposing of these preliminary questions, we turn to the standard a bankruptcy court must apply in making an FCR appointment under § 524(g) and to the propriety of Patton's appointment under that standard.

### A. Standing

As a threshold matter, we consider the Insurers' standing, as it appears that not all Appellants are properly before us. The two that were involved in *Warren Pumps*, Continental and National Union, unquestionably have standing to object to Patton's appointment based on his alleged conflict of interest with them specifically. The closer question is whether the remaining Insurers, who were not themselves involved in *Warren Pumps*, also have standing.

Appellants argue that they do because the conflict "implicate[s] the integrity of the bankruptcy process[.]" Rep. Br. 20. Relying on *In re Congoleum Corp.*, 426 F.3d 675, 685–86 (3d Cir. 2005), they contend that even if they themselves will not be prejudiced by Patton's appointment, they have standing to raise it on behalf of the future claimants. But Appellants mistake the import of *Congoleum*.

Both before and after that case, standing in bankruptcy appeals has been limited to "person[s] aggrieved" and, as we explained in *Travelers Insurance Co. v. H.K. Porter Co., Inc.*, parties meet that standard only when a contested order "diminishes their property, increases their burdens, or impairs their rights." 45 F.3d 737, 742 (3d Cir. 1995) (quoting *In re Dykes*, 10 F.3d 184, 187 (3d Cir. 1993)); *see also In re Combustion Eng'g, Inc.*, 391 F.3d at 214. The "person aggrieved" standard is thus "more restrictive" than Article III's

12

"case or controversy" requirement. *Travelers*, 45 F.3d at 741. But that is necessary. Bankruptcy proceedings "typically involve a 'myriad of parties . . . indirectly affected by every bankruptcy court order,'" so in the absence of such a stringent standing rule, collateral appeals could proliferate and unduly slow the emergence of the filer from the proceedings. *Id.* (alteration in original) (quoting *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 642 (2d Cir. 1988)); *see also Combustion Eng'g*, 391 F.3d at 215.

To the extent there was any question about the viability of *Travelers* after *Congoleum*, we clarify today that the "person aggrieved" standard we articulated there remains good law. The Insurers point out that a proper FCR appointment is required for a valid plan confirmation under § 524(g) and thus "involves 'procedural due process concerns that implicate the integrity of the bankruptcy court proceeding as a whole,'" just as we observed was true for the retention of the special insurance counsel in *Congoleum*. Rep. Br. at 21 (quoting *Congoleum*, 426 F.3d at 685). But it was the particular circumstances in *Congoleum* that led us to conclude that the insurers there were "entitled to standing even under the more restrictive standard applied to bankruptcy proceedings." *Congoleum*, 426 F.3d at 685; *see also In re Boy Scouts of America*, — F.4th —, 2022 WL 1634643, at *4 (3d Cir. 2022) (concluding that an appellant met the "person aggrieved" standard to challenge the retention of counsel where the "same considerations" involved in *Congoleum* applied). In particular, we observed that (1) "as a practical matter," it was "highly unlikely" that any parties other than those who sought standing in that case would seek to challenge the special insurance counsel's retention; (2) the insurers' objection seemed to have been made in good faith, based on their counsel's responsibility to report a clear violation of the ethical rules that would have otherwise been left unaddressed; and (3) it was "extremely important" that the purported conflict be addressed at the point when the insurers brought their challenge, as the court was unlikely to have another opportunity to do so. *Congoleum*, 426 F.3d at 685–87.

But the conditions discussed in *Congoleum* are not present here. First, there is no need to expand the pool of those with standing to raise this particular conflict in order to ensure

it receives judicial review.  In contrast to *Congoleum*, we do have other litigants here who are better equipped than the remaining Insurers to alert the court to the *Warren Pumps* conflict—the two insurers who were actually parties to *Warren Pumps*—and those litigants had ample time and opportunity to raise the issue before the Bankruptcy Court.

Second, in the absence of that need, it appears that the Insurers are only bringing this objection as a tactical one to delay Imerys's plan confirmation.  This is just the sort of bad-faith tactic that *Congoleum* itself recognized and cautioned against, because of the "acute need to limit appeals in bankruptcy cases."  *Congoleum*, 426 F.3d at 685–86 (citing *In re Combustion Eng'g, Inc.*, 391 F.3d at 217–18).

Finally, we are dealing here not with the permissive approval of a debtor's application for additional insurance counsel under § 327(e), as in *Congoleum*, 426 F.3d at 683, but with the bankruptcy court's mandatory appointment of the FCR under § 524.  Under § 524, the bankruptcy court itself must make the appointment and thus take an active role in considering and "protecting the rights of" the future claimants. 11 U.S.C. § 524(g)(4)(B)(i).  So the need for third parties to play that role is significantly reduced.  It is the court that is charged with protecting the integrity of the appointment process, and the Bankruptcy Court here did just that by identifying the potential conflict, requesting supplemental disclosures, and assuring itself of Patton's integrity before appointing him FCR.

In short, *Congoleum* did not eliminate *Travelers*'s heightened standard for bankruptcy appellate standing and it did not authorize parties to bankruptcy proceedings to raise conflicts of interest on behalf of other parties in all circumstances.  The Insurers here still must meet the "persons aggrieved" standard, and while Continental and National Union do,[5] Columbia Casualty Company, Continental

---

[5] In their letter response brief to the U.S. Trustee's amicus brief, the Insurers argue for the first time that they have standing to raise the future claimants' interests because Continental and National Union, who they contend "were

Casualty Company, Lamorak Insurance Company, and Berkshire Hathaway Specialty Insurance Company do not. Accordingly, those four insurers lack appellate standing and their claims will be dismissed on that basis.

### B.    Waiver

Before addressing the merits of the claims of Continental and National Union, we confront another threshold issue: whether they waived any objection based on the *Warren Pumps* representation by failing to timely raise it in the bankruptcy proceedings. An argument is waived where a party fails to "adequately raise it" with a "minimum level of thoroughness" in the lower court. *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 262 (3d Cir. 2009); *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 834–35 (3d Cir. 2011). And in bankruptcy appeals, avoiding a waiver determination at the district court or appellate court requires a party to have properly brought the argument before the bankruptcy court. *In re Trib. Media Co.*, 902 F.3d 384, 400 (3d Cir. 2018) (citing *Buncher Co. v. Off. Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 253 (3d Cir. 2000)).

Here, the Insurers objected to Patton's proposed appointment as FCR ever since Imerys first put his name forward, but the first time they raised the *Warren Pumps* representation issue was in a "supplemental objection" filed months after the Bankruptcy Court's deadline for objections had passed. JA 939.

As previously recounted, this was not because Young Conaway's involvement in *Warren Pumps* had only just come to light. Both Patton and Young Conaway had included

___

effectively sued by their own lawyer," can invoke doctrines developed to protect others as "a common mode of argument." Insurer Response to U.S. Tr. Amicus Br. at 2. But this has never been in dispute. The issue here is not whether, once standing is ascertained, the Insurers can mount arguments involving the interests of future claimants. The issue is whether, at the threshold, the remaining four Insurers—who have no apparent conflict with Patton or Young Conaway—can establish standing.

15

references to the litigation in their initial disclosures; the representation was likewise mentioned at the FCR appointment hearing; and, perhaps most significantly, the same attorney for the Insurers who cross-examined Patton about Young Conaway's asbestos and talc work at that hearing was also counsel to some of the insurers in *Warren Pumps* itself. The Insurers thus had adequate notice and opportunity to raise their *Warren Pumps* objection at the appropriate time in the FCR appointment process, and instead made the strategic decision to focus their objections on other grounds. Failing to bring an argument at the appropriate time can result in a finding of waiver. *See, e.g.*, *Pichler v. UNITE*, 542 F.3d 380, 396 n.19 (3d Cir. 2008) (holding an argument waived where a party raised it at oral argument, but not in its briefs); *Confer v. Custom Eng'g Co.*, 952 F.2d 41, 44 (3d Cir. 1991) (noting that the district court "exercised sound discretion" in deeming arguments waived that litigant had brought in a motion for reconsideration, but not in the original summary judgment papers).

And, to be clear, the Insurers' delay in bringing this argument was not without consequence. Much ink was spilled and hours of hearing testimony consumed on the subject of Patton's prepetition work with Imerys (the focus of the Insurers' objections for the bulk of the FCR appointment process), while there was little to no record development concerning any conflict with the *Warren Pumps* representation. As a result, the record is devoid of evidence about what Young Conaway might have learned in the *Warren Pumps* representation that could compromise the Insurers' or others' interests in this bankruptcy proceeding—information that would have helped us assess the existence, nature, and severity of the purported conflict. And the "general rule" that we will not "consider issues on appeal that were not raised in the lower courts" "applies with added force where," as here, "the timely raising of the issue would have permitted the parties to develop a factual record." *In re Am. Biomaterials Corp.*, 954 F.2d 919, 927–28 (3d Cir. 1992) (citations omitted).

In short, there are valid reasons to conclude, as the District Court did, that the Insurers waived their *Warren*

*Pumps* argument before the Bankruptcy Court.[6] But there are more compelling reasons to address it. For one, the Bankruptcy Court on its own initiative addressed the merits of the Insurers' objection, and we review the Bankruptcy Court's decision "unfettered by the district court's determinations." *Brown*, 951 F.2d at 567. For another, the waiver rule "is one of discretion rather than jurisdiction," and we may overlook waiver where, as here, the "public interest is better served by addressing [an argument] than by ignoring it" and addressing that argument does not cause "surprise or prejudice" to the parties. *Barefoot Architect*, 632 F.3d at 834–35 (internal quotation and citation omitted). Here, the open legal questions in the case have significant implications for bankruptcy law, and the parties will not be prejudiced because these questions were fully briefed following the Bankruptcy Court's issuance of a reasoned opinion on the merits. We therefore proceed to address the proper standard for appointing an FCR and the propriety of Patton's appointment under that standard.

### C. The Standard Applicable to FCR Appointments

The briefing and the opinion the Bankruptcy Court issued in this case offer us a wide range of alternatives for the

---

[6] The parties characterize this issue as one of forfeiture, but waiver and forfeiture are not precisely the same. Waiver contemplates that an argument has been "intentional[ly] relinquish[ed] or abandon[ed]," while forfeiture is merely a failure to timely raise an issue. *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 17 n.1 (2017) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). Because it seems in this case that the Insurers intentionally chose to raise other objections before the deadline, and only brought an untimely "supplemental objection" about the *Warren Pumps* representation after the Bankruptcy Court indicated that topic was of particular interest to it, we agree with the District Court's characterization of the issue here as waiver. Regardless, this distinction would not change whether we reach this issue. *See Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*, 877 F.3d 136, 147–48 (3d Cir. 2017) (noting that courts reach forfeited issues in "exceptional circumstances," such as "when the public interest requires").

standard applicable to FRC appointments. The Bankruptcy Court rejected the "disinterestedness" standard adopted by a handful of other courts, and held that "a legal representative under section 524 . . . must be independent of the debtors and other parties-in-interest in the case and must be able to act with undivided loyalty to demand holders." JA 33. While Imerys and Patton contend that 11 U.S.C. § 101(14)'s definition of "disinterested person"[7] should govern FCR appointments, the Insurers advocate for a "guardian-*ad-litem* test," which they acknowledge is what the Bankruptcy Court adopted in substance. But they do not stop there. The Insurers also urge us to apply § 327 of the Bankruptcy Code, which governs a trustee's employment of certain professionals and requires that any actual conflict of interest held by those professionals is *per se* disqualifying. 11 U.S.C. § 327(a), (c). Meanwhile, the United States Trustee, as amicus,[8] does not espouse the

---

[7] That definition provides that a "disinterested person":

> (A) is not a creditor, an equity security holder, or an insider;

> (B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

> (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

11 U.S.C. § 101(14).

[8] The United States Trustee participated in the FCR appointment process before the Bankruptcy Court, objecting to Patton's appointment on the basis that the Bankruptcy Court should have considered other candidates in addition to the one put forward by the debtor. However, the Trustee did not participate in the objection that spawned this appeal. We

18

application of § 327 but agrees with the Bankruptcy Court and the Insurers that FCRs "should be held to the high standards applicable to fiduciaries who represent parties not before the Court," such as guardians *ad litem*. U.S. Tr. Amicus Br. 2. As the Trustee frames it, "the [FCR] must be an effective advocate, free from any appearance of conflict of interest, and must have undivided loyalty to the future claimants he or she represents." *Id.* (citing *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928)).

For the reasons set forth below, we agree with the Bankruptcy Court and the Trustee that the FCR standard requires more than disinterestedness. An FCR must be able to act in accordance with a duty of independence from the debtor and other parties in interest in the bankruptcy, a duty of undivided loyalty to the future claimants, and an ability to be an effective advocate for the best interests of the future claimants.[9] We reach this conclusion after considering (1) the Bankruptcy Code itself; (2) the parties' arguments concerning legislative history and legislative acquiescence; (3) the standards governing creditors' committees, which we see as playing an analogous representational role in the bankruptcy process; and (4) the administrability of the fiduciary standard

therefore invited him to submit supplemental amicus briefing regarding the appropriate FCR appointment standard. We are grateful the Trustee accepted that invitation and appreciate his prompt response and excellent quality of the submission.

[9] The parties generally refer to this standard as a "guardian *ad litem*" standard—a characterization also referenced by the court in *In re Fairbanks Co.*, 601 B.R. 831, 841 (Bankr. N.D. Ga. 2019), which the Bankruptcy Court below considered in fashioning its standard. But using that precise label is unnecessary and may have unintended consequences. We do not suggest, for example, that an FCR *is* a guardian *ad litem* for the future claimants; true guardians *ad litem* have the legal authority to bind those they represent, which an FCR does not (it merely participates in the negotiation of a plan and channeling injunction that will govern its constituents' future claims). What we adopt here is merely a standard *akin* to those employed for guardians *ad litem* in other contexts.

19

we adopt in the bankruptcy context. Because many of the district and bankruptcy courts in our Circuit had settled on the disinterestedness standard from which we now depart,[10] we address each of these considerations in some detail.

1.  Text and Structure of the Bankruptcy Code

The Code does not explicitly lay out an FCR appointment standard. It specifies only that, in order for a channeling injunction to be enforceable in combination with an asbestos trust, the court must do two things: (1) as part of the bankruptcy proceedings leading to the issuance of that injunction, "appoint[] a legal representative for the purposes of protecting the rights" of the future claimants, and (2) "determine[]" that the terms of the injunction are "fair and equitable with respect to" the future claimants," in light of the benefits" provided to the trust by the debtor and other relevant parties. 11 U.S.C. § 524(g)(4)(B).

We begin with the text of the Code, for "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)). Congress specifically chose to deploy § 101(14)'s "disinterested person" standard in eleven other sections of the Code. *See* 11 U.S.C. §§ 327(a), 328(c), 332(a), 333(a)(2)(A), 701(a)(1), 703(c), 1104(b)(1), (d), 1163, 1183(a), 1202(a), and 1302(a). In § 524(g), however, it did not.

Given the structure and context of the Code, that is not surprising. As the Bankruptcy Court noted, the sections in

---

[10] *See, e.g.*, *In re Duro Dyne Nat'l Corp.*, No. 18-15563, 2019 WL 4745879, at *9 (D.N.J. Sept. 30, 2019); *Fed. Ins. Co. v. W.R. Grace*, Nos. 04-844, 04-845, 2004 WL 5517843, at *7 (D. Del. Nov. 22, 2004); *In re Maremont Corp.*, No. 19-10118, ECF No. 126, at 101 (Bankr. D. Del. Mar. 8, 2019)); *In re Leslie Controls, Inc.*, No. 10-12199, ECF No. 146, at 70 (Bankr. D. Del. Aug. 9, 2010).

which the Code applies the "disinterested person" standard relate to professionals whose duties run to the entire estate or to the court, requiring that they remain impartial. Section 327, for example, applies to "attorneys, accountants, appraisers, auctioneers, or other professional persons" who are hired by the trustee and approved by the court "to represent or assist the trustee in carrying out the trustee's duties[,]" but excludes any professional who "represent[s] an interest adverse to the estate." 11 U.S.C. § 327(a). The FCR, by contrast, is the "legal representative" for just such an adverse interest, having been appointed specifically "for the purpose of protecting the rights of" future asbestos claimants. *Id.* § 524(g)(4)(B)(i).

The absence of language invoking the disinterested person standard in § 524(g) thus counsels against adopting that standard for FCR appointments.

But if the language Congress chose to leave out from § 524(g) is significant, so too is that which it opted to include. Section 524(g) directs that the bankruptcy court appoint a "legal representative" for certain interests. *Id.* § 524(g)(4)(B)(i). "Legal representative" is a term of art, referring to one who owes fiduciary duties to his absent, represented constituents. *See, e.g.*, *Kem Mfg. Corp. v. Wilder*, 817 F.2d 1517, 1520 (11th Cir. 1987) (construing "legal representative" in Fed. R. Civ. P. 60(b)). And "it is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that [a]re attached to [it]." *See FAA v. Cooper*, 566 U.S. 284, 292 (2012) (internal quotations omitted). We presume, therefore, that when Congress employed that term in § 524(g), it anticipated that the FCR would serve as fiduciary to the future claimants. Indeed, legal representatives and their attendant fiduciary duties are central to the bankruptcy process. *See, e.g.*, *Listecki v. Official Comm. of Unsecured Creds.*, 780 F.3d 731, 739 (7th Cir. 2015) (creditors' committee is a representative for "the larger interests of the unsecured private creditors" and so "it is to them . . . that the committee owes a fiduciary duty); *In re AFI Holding, Inc.*, 530 F.3d 832, 845 (9th Cir. 2008) (a trustee is both "the 'legal representative' and 'fiduciary' of the estate"); *In re Smart World Techs., LLC*, 423 F.3d 166, 174–75 & n.12 (2d Cir. 2005) (the debtor-in-possession is a "legal representative of the bankruptcy estate"

21

and thus is a "fiduciary" for the estate, just as the creditors' committee "owes a fiduciary duty to the class it represents").

The statutory text of § 524(g) therefore suggests that an FCR appointed under that section must be more than merely disinterested, and instead be able to fulfill the heightened duties owed by fiduciaries.

## 2.    Legislative History and Acquiescence

The legislative history and acquiescence arguments on which some courts have relied likewise provide little support for the "disinterested person" standard. *See, e.g.*, *In re Duro Dyne Nat'l Corp.*, No. 18-15563, 2019 WL 4745879, at *9 (D.N.J. Sept. 30, 2019).

Whatever one thinks of using legislative history to interpret statutes, it is of little help here. It appears that Congress drafted § 524(g) to codify the trust-and-channeling injunction mechanisms pioneered in the Johns-Manville and UNR Industries bankruptcies and that it was satisfied with the protection they provided to future claimants. *See* H.R. REP. NO. 103-835, at 41 (explaining that § 524(g) was crafted "in order to strengthen the Manville and UNR trust/injunction mechanisms and to offer similar certitude to other asbestos trust/injunction mechanisms that meet the same kind of high standards with respect to regard for the rights of claimants, present and future, as displayed in the two pioneering cases"). It also appears that the *Johns-Manville* and *UNR* courts applied something like the disinterested standard to their choice of proto-FCRs.[11] Neither, however, was explicit about doing so.

---

[11] In *Johns-Manville*, the court scheduled a hearing to address the role of the representative for future claimants, and noted that while it was "consider[ing] in preliminary fashion several formulations of legal representation: guardian ad litem, amicus curiae and examiner," it was not precluded from adopting another model altogether. *In re Johns-Manville Corp.*, 36 B.R. 743, 758–59 (Bankr. S.D.N.Y. 1984) (footnote omitted). Following that hearing, the court appointed a representative for future claimants that would exercise the same powers as creditors' committees, a decision affirmed by

And the congressional report accompanying the bill, while gesturing generally to the Johns-Manville and UNR bankruptcies, never specifically called out their FCR appointment processes. *See id.* at 40–41 (omitting mention of the FCR position in its discussion of the new § 524(g)).

As for the legislative acquiescence argument, legislative silence does not often tell us much, and here it tells us nothing. It is true that—against the backdrop of certain courts importing § 101(14)'s "disinterested person" test into § 524(g)—Congress amended § 524 on three occasions[12] without clarifying the test for FCRs. But that silence does not portend acquiescence because there was only a smattering of district and bankruptcy court cases on point, not the "longstanding interpretation" and "almost perfect consistency" in the decisions of the Courts of Appeals, *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200–01 (1974), or the "virtual

the district court. *See In re Johns-Manville Corp.*, 52 B.R. 940, 942–43 (S.D.N.Y. 1985). By opting for this model of representation, in which the representative had no authority to bind future claimants, *id.* at 943, the court implicitly rejected the previously proposed guardian *ad litem* model, *see* 36 B.R. at 758 n.7 (explaining that future claimants "would be bound by the actions of [a guardian *ad litem*] by virtue of the doctrine of equitable virtual representation" if it relied on that model).

The *UNR Industries* court similarly entrusted its future claimants' representative with a creditors' committee's powers. *In re UNR Indus., Inc.*, 46 B.R. 671, 676 (Bankr. N.D. Ill. 1985). In soliciting nominations for that representative, it called for someone who was a "disinterested party to serve as Legal Representative for putative asbestos disease victims." *Id.* Without further explanation, it is difficult to determine if the UNR court deliberately chose disinterestedness as the standard, so much as invoked it as a default.

[12] *See* Small Business Reorganization Act of 2019, Pub. L. No. 116-54, § 4(a)(9)(A)–(C), 133 Stat. 1086, 1087 (2019); Bankruptcy Technical Corrections Act of 2010, Pub. L. No. 111-327, § 2(a)(19), 124 Stat. 3557, 3559 (2010); Bankruptcy Abuse and Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, §§ 202, 203(a), 119 Stat. 43, 194 (2005).

unanimity" among the federal courts over decades, *Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 338 (1988), as have been present when past courts have assumed legislative acquiescence. In addition, the amendments to § 524 were specific and targeted, and as the Supreme Court has cautioned, "when 'Congress has not comprehensively revised a statutory scheme but has made only isolated amendments . . . [i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of [a court's] statutory interpretation.'" *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341, 1351 (2021) (alterations in *AMG Cap. Mgmt.*) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001)). In short, § 524's history as concerns the "disinterested person" standard is at best inconclusive.

### 3. Analogy to the Creditors' Committee

We find useful guidance, however, in the jurisprudence surrounding an analogous player in the bankruptcy process: the creditors' committee.

Just as a creditors' committee exists to serve the interests of its constituents, the various creditors, the FCR serves the interests of his constituents, the future claimants. *See Listecki v. Official Comm. of Unsecured Creds.*, 780 F.3d 731, 739 (7th Cir. 2015) (noting that "a [creditors'] committee represents the larger interests of the unsecured private creditors, and it is to them, and not the Trustee, court, or any governmental actor, that the committee owes a fiduciary duty" and collecting cases). And in the creditors' committee context, even though the Code only specifies that the committee be "adequate[ly] representat[ive]" of the relevant creditors, 11 U.S.C. § 1102(a)(2), courts have long required each committee member not only to be free of conflicts of interest but also to fulfill fiduciary duties to the committee's constituents, including duties of undivided loyalty and honesty. *See generally* 7 COLLIER ON BANKRUPTCY ¶ 1103.05[2] (16th ed. 2021) (summarizing the fiduciary duties of committee members); *see also, e.g.*, *Woods v. City Nat. Bank & Tr. Co. of Chi.*, 312 U.S. 262, 268 (1941) ("Protective committees . . . are fiduciaries."); *In re Kensington Int'l, Ltd.*, 368 F.3d 289, 315 (3d Cir. 2004) ("[I]t is established that a Creditors Committee

24

owes a fiduciary duty to the unsecured creditors as a whole[.]”); *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (“Section 1103(c) of the Bankruptcy Code, which grants to the Committee broad authority to formulate a plan and perform ‘such other services as are in the interest of those represented[,]’ . . . has been interpreted to imply . . . a fiduciary duty to committee constituents[.]”).

For an FCR, who functions, in effect, as a “creditors’ committee” of one, that fiduciary standard is equally appropriate, so in view of its long-standing application in that similar context and the text of the Code itself, that is the standard we adopt today.

### 4. Administrability

We next address the administration of the fiduciary standard in the FCR appointment process.

To be clear, that standard does not herald a categorical approach to an FCR’s appointment. The parties to this appeal vigorously dispute whether Patton had a concurrent conflict of interest as a result of the *Warren Pumps* litigation, the implication being that it would disqualify him *per se*.[13] But the question of *whether* a conflict exists is less relevant to an appointment than the nature of the conflict and importance of the conflict to the future claimants’ interests. In a given instance, a purported ethical conflict might have minimal or no

---

[13] The categorical approach advocated by the Insurers would effectively preclude service by the most effective FCRs, for the reality is that the current universe of qualified and experienced FCRs is small, *see* Lloyd Dixon *et al.*, *Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts*, RAND INST. FOR CIV. JUST., at App. B (2010) (listing 26 of the largest active trusts and three of the largest proposed trusts as of 2010, with seven FCRs who serve on two or more of them); JA 735 (noting that Patton currently serves as FCR for six different trusts), and it is entirely to be expected that the law firms that are home to those professionals with experience in asbestos-related bankruptcies would also be involved in asbestos-related insurance coverage litigation.

impact on an FCR's ability to successfully represent the future claimants' interests. For instance, the litigation giving rise to the conflict may be long over or subject to effective ethical walls at the FCR's firm. In such cases, the court, in its discretion, may well determine that the proposed FCR still meets the appointment requirements.[14]

The comparison to a creditors' committee is again instructive, for those members have some degree of inherent "conflict" in that they each have their own interests as individual creditors that are arguably adverse to other creditors. Yet they may still serve on the committee if they can act independently of their self-interest and fulfill their fiduciary duties to the creditors as a whole. *See Westmoreland Hum.*

---

[14] Along similar lines, the Insurers ask us to decide whether Rule 1.7 of the Model Rules of Professional Conduct applies to the FCR role, which Imerys disputes because the FCR is not, technically, a "lawyer" representing a "client" as contemplated by the terms of the rule. But this debate is largely beside the point. First, even for those practicing lawyers who are undisputedly covered by the ethics rules, the bankruptcy court still has discretion to decide whether or not those rules should result in disqualification under the circumstances: "[A] court's . . . decision about whether to use that power is discretionary and 'never is automatic.'" *In re Boy Scouts of America*, — F.4th —, 2022 WL 1634643, at *7 (3d Cir. 2022) (quoting *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980)). Thus, "even when an ethical conflict exists (or is assumed to exist), a court may conclude based on the facts before it that disqualification is not an appropriate remedy." *Id.* Second, the ethics rules themselves, even if they applied, would not determine whether an FCR candidate meets the appointment standard we set today. If an "actual conflict" under the Rules is merely technical and extremely unlikely to prejudice the interests of the future claimants, the bankruptcy court can still properly make the appointment under § 524 after engaging in the appropriate analysis of the future claimants' interests and the appointee's abilities and qualifications. *Cf. id.* at *5 (noting in a conflicts analysis under § 327 that the Rules "may be informative in some cases," but are not determinative of what an "actual conflict" is under the terms of that section).

*Opportunities, Inc. v. Walsh*, 246 F.3d 233, 256 (3d Cir. 2001) ("We have construed § 1103(c) as implying a fiduciary duty on the part of members of a creditor's committee . . . toward their constituent members. A committee member violates its fiduciary duty by pursuing a course of action that furthers its self-interest to the potential detriment of fellow committee members." (citing *In re PWS Holding Corp.*, 228 F.3d at 246)). Just so, the mere existence of a technical conflict should not disqualify an FCR if the bankruptcy court concludes he or she will meet the duties of independence and undivided loyalty and will serve as an effective advocate for the future claimants.

While we have settled on an FCR appointment standard, we do not today prescribe any particular process the bankruptcy court must follow in making that appointment. Of course, implicit in the FCR appointment standard is one procedural requirement: that whatever process the bankruptcy court follows ensures that the court has the information necessary to assess the candidate(s)'s qualifications. But given that "as part of the proceedings leading to issuance of [a channeling] injunction, the court appoints a legal representative for the purpose of protecting the rights of" future claimants, 11 U.S.C. § 524(g)(4)(B)(i), variations in the appointment process are otherwise within the discretion of the bankruptcy court.

### D.     Propriety of Patton's Appointment

With the FCR appointment standard set, we now turn to the question of whether Patton was properly appointed to the FCR position in the Imerys bankruptcy. It is important to note that, ultimately, neither the Insurers nor the Bankruptcy Court raised any question regarding Patton's qualifications, independence, undivided loyalty, or ability to be an effective advocate for future claimants apart from the purported ethical conflict arising out of Young Conaway's work on *Warren Pumps*.

The Insurers nonetheless contend that Young Conaway's *Warren Pumps* representation prevents Patton from meeting the FCR appointment standard. Essentially, they make two arguments: first, that *Warren Pumps* creates a direct conflict of interest between Patton and Continental and

27

National Union themselves, which requires his disqualification; and second, that his *Warren Pumps* connection taints his independence and ability to be an effective advocate on behalf of the future claimants' interests. Neither are persuasive.

### i. Alleged Direct Conflict of Interest

To the extent Continental and National Union argue that *Warren Pumps* requires Patton's disqualification because of the direct conflict of interest it creates between the two companies and Patton, the Bankruptcy Court was correct in ruling that the prospective waiver disposed of this issue. In that waiver provision, those Insurers acknowledged that Young Conaway maintained a "substantial corporate workout, bankruptcy[,] and insolvency practice," and that they "agree[d] that [Young Conaway] may represent other clients (i) in workout, bankruptcy[,] and insolvency proceedings, and (ii) in connection with trusts established pursuant to section 524(g) of the Bankruptcy Code." JA 898. They also agreed they "w[ould] not assert that this instant Engagement is a basis for disqualifying [Young Conaway] from representing others" in those bankruptcy-related matters if those Insurers were creditors of the debtor in those bankruptcies and if the interests of Young Conaway's clients in those matters were "directly adverse" to the Insurers.[15] JA 898–99.

The Insurers next argue that it was impossible for them to have given informed consent to the conflict when it arose in the Imerys bankruptcy because Patton's prepetition work as Proposed FCR was done pursuant to a non-disclosure agreement. Even aside from the fact that the Insurers are sophisticated parties who were represented by both an agent

---

[15] Of course, this was subject to the condition that the future bankruptcy-related matters were not "the same matter or a matter substantially related to the same matter" as the one in which Young Conaway represented the Insurers. JA 898. For the reasons explained below, however, Continental and National Union have not met their burden to establish that this condition of the waiver was not met. *See, e.g.*, *Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington*, 652 F. Supp. 1281, 1283 (D. Del. 1987).

and that agent's insurance counsel, their argument misapprehends what we require of valid prospective waivers. Prospective waivers do not necessitate a second round of consent when a future conflict actually arises; that would defeat the purpose of obtaining a prospective waiver in the first place. Rather, the question is whether *at the time of signing the prospective waiver* the clients could give "truly informed consent" as to the potential conflicts that foreseeably might arise in the future. *Congoleum*, 426 F.3d at 691; MODEL RULES OF PRO. CONDUCT, r. 1.7 cmt. 22 ("The effectiveness of such [prospective] waivers is generally determined by the extent to which the client reasonably understands the material risks that the waiver entails."). And the waiver at issue here was quite clear not only that Young Conaway might be involved in bankruptcy proceedings in which the Insurers would be creditors, but also that the firm was likely to be involved in FCR work specifically.

As such, the Bankruptcy Court was justified in concluding that the *Warren Pumps* insurers would have known at the time of signing that there was a material risk that Young Conaway would be involved in the future in § 524(g) proceedings that would also involve insurance company creditors, a risk that materialized with the Imerys bankruptcy.[16] *See, e.g.*, *In re Fisker Auto. Holdings, Inc. S'holder Litig.*, 2018 WL 3991470, at *3–4 (D. Del. Aug. 20, 2018) (upholding the

---

[16] Along similar lines, although we concluded *supra* that § 327 does not govern FCR appointments, we note that even the Insurer's requested analysis under that section's *per se* disqualification provision would have required more information regarding the *Warren Pumps* litigation. In urging us to apply § 327's requirements, the Insurers do not identify an actual (or even a potential or apparent) conflict other than the fact of Young Conaway's involvement in the *Warren Pumps* litigation. As recently explained, "a conflict is actual [for the purposes of § 327] when the specific facts before the bankruptcy court suggest that 'it is likely that a professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest.'" *Boy Scouts*, — F.4th —, 2022 WL 1634643, at *4 (3d Cir. 2022) (quoting *In re Pillotex, Inc.*, 304 F.3d 246, 254 (3d Cir. 2002)). Those facts are lacking here.

validity of a prospective waiver based on an analysis of the waiver's language and the sophistication of the parties).

### ii. Ability to Provide Effective Advocacy

The Insurers' only remaining argument is that because the *Warren Pumps* litigation "involve[d] substantially related issues" as will be raised in the Imerys Bankruptcy, JA 945, it impairs Patton's ability to serve the future claimants' interests.

Their primary argument on this point is that a future claimant "would probably be displeased" with Patton's appointment, "[e]specially when . . . this isn't an unrelated case [to the *Warren Pumps* litigation]" and "[t]he arguments that [Young Conaway] was making in that case" about policy interpretation issues would be "adverse" to the arguments the FCR can be expected to make about the Insurers' policies in this bankruptcy.[17] Tran. 64. But in typical conflicts analyses, "substantially related" does not refer to the similarities between the legal issues raised; rather, "[m]atters are 'substantially related' . . . if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." MODEL RULES OF PRO. CONDUCT r. 1.9 cmt. 3 (AM. BAR ASS'N 2020); *see also* RESTATEMENT (THIRD) OF LAW GOVERNING LAWYERS § 132 (2000).

Because the Insurers fail to show that *Warren Pumps* involved the same transactions or legal disputes as might be implicated by Patton's future work as FCR in the Imerys bankruptcy, we can only say that the matters are "substantially

---

[17] Apart from this argument, the Insurers support their contention of the cases being "substantially related" with only vague assertions that in both cases, "(i) more than one corporate entity asserts a claim to insurance policy proceeds, (ii) insurers have contribution rights among insurers, and (iii) there are issues raised regarding whether excess policies owe defense obligations and to whom under what limitations and conditions," JA 975-76.

30

related" if there is a "substantial risk" that Patton and Young Conaway will use in the Imerys bankruptcy any confidential information that Young Conaway obtained from its representation of Continental and National Union in *Warren Pumps*. That is a fact-specific inquiry, *see, e.g.*, *Madukwe v. Del. State Univ.*, 552 F. Supp. 2d 452, 458 (D. Del. 2008), and the Insurers simply do not point to any facts that would establish any risk of weaponized confidential information.

In any event, the Bankruptcy Court carefully considered this issue. After it set out an appointment standard quite close in substance to that which we adopt today—one centered on Patton's ability to serve the future claimants' interests effectively and impartially—the Court requested additional disclosures concerning the particular matters it thought relevant to its determination of whether Patton met that standard. One of those matters was Patton's involvement in Young Conaway's previously disclosed representation of "many if not all of the Certain Excess Insurance companies in insurance coverage litigation related to environmental liabilities, including asbestos liabilities." JA 32. In response to that request, the Court received and considered not only Patton's disclosures, but also the unsolicited supplemental objection of the Insurers raising the *Warren Pumps* conflict, Patton's response to that objection, and several related declarations and exhibits. And what they revealed only bolstered the Court's confidence in Patton: that Young Conaway had implemented an ethical wall between its work on *Warren Pumps* and Patton's work as FCR in the Imerys bankruptcy, that Patton himself was never involved in the *Warren Pumps* matter at all, and that Young Conaway had billed only a handful of hours to the matter since 2016 and none since 2018. Given the state of the record on this issue and Patton's reputation and qualifications for the FCR role, the Bankruptcy Court did not abuse its discretion in concluding that the alleged conflict would not impair Patton's performance, and that his credentials, experience, and expertise would serve the future claimants' interests with the required degree of independence and loyalty.

**IV.    CONCLUSION**

For the foregoing reasons, we will affirm the judgment of the District Court.